## Elliott et al. v. Pikeville Nat. Bank & Trust Co.

May 12, 1939.

326

O. T. HINTON and WM. J. BAIRD for appellants.

J. J. MOORE and HENRY SCOTT for appellee.

OPINION OF THE COURT BY MORRIS, COMMISSIONER—Affirming.

In the suits below appellee was plaintiff; W. K. Elliott, the Elliott Coal Company, the Fannin Coal and Land Company and its officers, Ernest Elliott and A. F. Childers were defendants. W. K. and Ernest Elliott and A. F. Childers are appellants.

At the time of institution of suits W. K. Elliott was president of the Elliott Coal Company, located at Betsy Lane, and vice-president of the Fannin Company, owner of the land on which the Elliott Company had been mining for about twenty years.

In July, 1937, the bank held notes on which W. K. Elliott was primarily and otherwise liable, as follows: Elliott's note of June 17, 1936, $10,375, payment secured by collateral valued by the maker at $12,000 or more

and a mortgage on land valued by the maker at $6,000 to $8,000. W. K. Elliott's note of the same date for $2,730, endorsed by Childers; an Elliott Coal Company note for $7,000, payment secured by a mortgage on real estate belonging to W. K. Elliott, estimated to be worth from $8,000 to $10,000, and 62½ shares of Fannin Company stock, estimated to be worth around $100 per share, the note endorsed by W. K. Elliott. Another Elliott Company note for $4,400, secured by mortgage on the mining equipment of the Elliott Company, and one for $735 endorsed by W. K. Elliott.

The Fannin Company, in which W. K. Elliott owned a majority of the stock, owed the bank the following notes: One for $2,955.50, another for $1,047.56, Ernest Elliott owed $400 the note bearing endorsement of the father, W. K. Elliott, who was also accommodation endorser on other notes to the bank. It is noted that W. K. Elliott was obligated to the appellee on July 17, 1937, when the notes were due or past due, in the sum of $29,242.56.

The notes were renewals; some had been running for more than ten years. Prior to July 27th the bank was strenuously pressing for payment. National banking authorities were looking askance at the paper, demanding that the bank make collection, or charge off. At the time the mine was not successful in its operations, nor had it been for some time past. Mr. Elliott's finances were admittedly at a low ebb. He, assisted by the bank, had made unsuccessful attempts to lease the mine, and the property and equipment were fast deteriorating. The critical situation was explained to Mr. Elliott, who suggested an assignment. He was assured that the bank's attitude was otherwise; it insisted on some movement which would result in a substantial reduction of his obligations. Mr. Elliott testified that he had under negotiation a loan of about $12,000 at the time of the final pressure by the bank, and insists that he was not given time to close the deal.

On July 27, 1937, the president of the bank demanded a substantial reduction of Mr. Elliott's liabilities; failing therein the bank would be compelled to institute legal proceedings. Mr. Elliott again suggested assignment, but it was the opinion that a forced sale would result in a sacrifice, avoidance of which was desired by parties. On that day, Mr. Moore, the bank president, prepared the paper copied below, and pre-

sented it to Mr. Elliott, who read it and said it was all right, but requested time until August 15, to negotiate further for a loan. During the latter part of August, nothing having been done toward reducing the obligations, Mr. Elliott signed the writing after talking the matter over with his son and an attorney. The writing follows:

"Pikeville National Bank,
"Pikeville, Kentucky
"Gentlemen:

"This letter is to authorize you to dispose of all the mine equipment and property embraced within the mortgage which we gave you bearing the date of 21st of June, 1935, in any way you deem best for the purpose of satisfying our indebtedness to you or any debt which W. K. Elliott may owe you.
"Elliott Coal Company
"By W. K. Elliott, President."

Shortly thereafter the bank, through its president, sold the equipment for $13,000, and the proceeds were applied to the various debts as follows: The note for $735 with $9.06 interest, and note for $4,400 (interest $54.26) were paid in full. Another note of the Elliott Coal Company for $7,000 was credited by $1,500, and the note of W. K. Elliott, $10,373, was credited by $4,373, a total credit of $12,073.32. The balance of the proceeds, $926.68, was held by the bank to be used as discount upon the renewal of the notes, wholly or in part unpaid, but later applied to some of the notes.

On October 9, 1936, the bank filed petition in equity, seeking judgment on each and all the notes, payment of which was secured by liens, subject to the credits stated, and defendants admitting the execution of the notes and credits, denied there was any balance due, because paid in full on August 31, 1937. They set out the document copied above, and Mr. Elliott admitting the signature on or about the 29 day of August, says it was signed and delivered at the instance and request of plaintiff "and under threats of immediate suits and foreclosure proceedings if he failed or refused to sign said contract, and he did sign and deliver said contract in writing to the plaintiff, thereby paying any and all debts and obligations which the defendant Elliott, and the Elliott Coal Company owed to the plaintiff." That pursuant to the contract plaintiff took over all the mine equipment,

which defendants alleged was of the reasonable value of $50,000, and disposed of same, and that as per the agreement such action on the plaintiff's part was in full and complete satisfaction of all obligations of W. K. Elliott and the Elliott Coal Company. They asked that the mortgage be cancelled; that plaintiff be required to return the Fannin Company stock, and for dismissal of plaintiff's petition. To this answer the plaintiff filed general demurrer, which was sustained with leave.

By amendment they challenged the corporation of plaintiff as such. In a second paragraph they plead that by "mutual agreement entered into between the parties the note sued on was satisfied in full." There was no allegation of fraud, but defendants alleged that the contract was ambiguous and its terms uncertain, and did not clearly express the agreement that plaintiff was to accept the surrender of the mine equipment of the Elliott Company, in full satisfaction of the company's and W. K. Elliott's obligations, but that it did so accept and dispose of said property and instead of cancelling all obligations embraced in the agreement, merely credited certain notes. By agreement of parties all affirmative allegations of the answer and its amendment were controverted of record.

The suits against Elliott and A. F. Childers and Ernest Elliott and the father (the latter filed on a later date) were ordinary actions. Omitting from the answers any reference to pledges of collateral, they as did pleadings in the other equity suits, followed substantially the answers and amendments in the other case. The same is true as to the actions against the Fannin Company, except that it confessed judgment, but W. K. Elliott filed separate answer and cross-petition, wherein he plead as he had in other cases, and on a cross-petition alleged that under the arrangement with the bank, he had paid the Fannin Company debt, and asked cross-judgment against it for $2,995. He further plead as to the $1,047.56 note that same was attempted to be executed, by the company's president, and that it was not signed by him, hence did not bind the company, and it was under no obligations to pay; that the confession of judgment was collusory and fraudulent, and done for the purpose of defrauding stockholders, he being a majority holder.

On December 5, 1937, on plaintiff's motion, over defendants' objection, the ordinary cases, except the Ern-

est Elliott case were transferred to the equity docket, and all were consolidated. Thereafter, plaintiff amended its petition against W. K. Elliott et al., allowing further credits which it had received by payments of royalties to the bank.

The record shows that in the case of Bank v. Elliott and Childers only, defendants moved the court for an issue out of chancery, which, over defendants' objection, the court overruled. The issue stated was as to "whether the letter referred to in the answer. is the true contract between the parties."

Issues were completed, much proof taken and by "agreement of parties," the Ernest Elliott case was consolidated with the other cases, and the court called attention to the fact that a demurrer had been sustained to the answer of W. K. and Ernest Elliott, and they having declined to plead further, rendered judgment against them for the amount of their note, with interest. Appeal was granted.

Plaintiff was adjudged $7,000 against the Elliott Coal Company and W. K. Elliott, with interest, subject to the credits mentioned with prior lien on the Pikeville property, mortgaged to secure payment of the note, and on the shares of the Fannin Company stock.

It was adjudged that plaintiff recover of the Fannin Company, W. K. Elliott and M. C. Justice, $2,995 and $1,047.56 with interest. Judgment was also rendered against Elliott and Childers for $2730, with interest, and against W. K. Elliott in the sum of $10,375, with interest, subject to credits of $5,375; part of the proceeds of sale of equipment; $1,917.64, and $150.75 royalties paid plaintiff, with a lien on the land under mortgage to secure this debt, and sale of the stocks and various tracts was directed. The receiver was directed to pay any royalties collected on behalf of the Elliott Coal Company, and to credit "this" judgment with such amounts collected, and paid. To "all" this judgment the defendants objected, excepted, prayed and were granted appeals.

It is apparent from the pleadings that the major question presented involves the construction to be placed on the letter of July 27, 1937, signed after the 15th of August. Appellants insist that the agreement was a complete release of all indebtedness to plaintiff bank. On the other hand, appellee contends that the

writing gave the bank the authority to sell the equipment for the purpose of applying the proceeds to payment ·of the coal company's indebtedness, or any debt which W. K. Elliott owed it. It takes the correct position that the bank could have, had it so pleased, used the entire sum to pay the coal company's indebtedness, but applied a portion, $5,375, to Mr. Elliott's debt, and since the company is not complaining, and Mr. Elliott benefited thereby, he should not be heard to complain. However, before taking up the major question we will advert to the procedural question, which it is contended, was erroneously decided adversely to appellants.

It is contended first, that the court erred in transferring the ordinary actions, Bank v. Fanning Company and Same v. Elliott and Childers, to the equity docket, over the objection of defendants.

On this point counsel argues that Sections 10 and 11 of the Civil Code of Practice prescribe the only conditions under which an ordinary action may be transferred to the equity docket. It is said that none of the circumstances authorizing the transfer of the Elliott and Fannin Company cases existed. The main insistence seems to be based on Subsection 4 of Section 11 of the Civil Code of Practice, which provides:

"If there be an issue which was not cognizable in chancery, and an issue which was cognizable in chancery, but not exclusively so, before the said day [August 1, 1851], the case shall not be transferred to the equity docket without consent of the parties."

As will be shown there was only one issue in the case in which motion to transfer was sustained, and that was and is cognizable in chancery, and under Section 10, Subsection 4, Civil Code of Practice, the court had the right and power to transfer the case to the equity docket, without consent of the parties.

There were four or more suits brought by the same plaintiff against different defendants. Some presented matters which required them to be placed on the equity docket; others were ordinary. The issues in all were similar. The only ground upon which we could now say that the court erred in transferring the ordinary case, Bank v. Childers, or in not submitting the issue to a jury, would be that he abused his discretion to the prejudice of appellant. Counsel argues that the question presented here (in addition to questions of liens)

was whether or not the liens should be enforced, which in turn depended on the question as to whether or not the notes had been paid, still in turn based on "whether or not the agreement in question released W. K. Elliott and the Elliott Company from all their debts to appellee."

The motion for issue out of chancery was to "try the issue made by the pleadings as to whether the letter referred to in the answer and filed with the same, is the true contract between the parties." In the Elliott-Childers' case, defendants admitting the execution of the note and the letter of July 27th, plead the delivery of the Elliott Company mining equipment, and that its sale was "to pay any and all debts and obligations which the" company and W. K. Elliott owed plaintiff. This agreement was set out in the joint answer, thus pleading the agreement as being the true contract.

Under their pleadings, original and amended answers, the only matter to be determined by the court was whether the contract was indefinte. The evidence upon which it was sought to interpolate words into the contract did not in the least have reference to the Elliott-Childers debt, because there was no property of Mr. Elliott or liens on his property to be or which could be released.

It is argued that the court's refusal to have issue out of chancery was of error, because the trial judge was prejudiced against defendants, particularly Mr. Elliott. This charge arose upon a motion for continuance, accompanied by affidavit setting out the supposed prejudice of the court. We are unable to see the slightest evidence of bias or prejudice in the court's rulings, or in rendering judgment. We also note that there was no movement toward having the trial judge vacate the bench.

We come now to the final contentions of appellants. It is argued that under well-known rules of construction, in case of doubt, the writing evidencing the agreement will be construed most strongly against the draftsman, and this is ordinarily accepted as a sound rule, "though it is the last one which the court will apply, and then only if a satisfactory result cannot be reached by other rules of constructions. The rule is never applied to words which are the common language of both

parties, nor where the intention is clearly expressed." 13 C. J. 545.

The rule should not strictly apply here, for, although it is admitted that when first shown to Mr. Elliott, he agreed that he would later sign the letter, but waited more than a month and then signed, after showing it to his son and later to an attorney. Mr. Elliott also said it was to be submitted to the bank for acceptance by the directors. Furthermore, the court is inclined to the opinion that insofar as the written document is concerned, there can be little doubt, if any, about the meaning of the language used.

It is contended that when the letter was finally signed and delivered to the bank, as Mr. Elliott says for the purpose of acceptance by the board, certain conversation was engaged in by the parties, about which there is some disagreement. On the day it was signed Mr. Elliott's son was with him at the bank. The son testified that he examined the paper; read it over and told his father not to sign it, and further, evidently addressing Mr. Moore, said: "What do you mean by wanting us to sign this?" And Moore replied: "This is the only way your father can have the rest of his property released." The son then asked: "What about my indebtedness to the bank?" and "he said, 'this won't release it'". The son gave no explanation of why he objected to his father's signing the paper. Father and son plead the letter as release of the son's debt.

Mr. Elliott said that after the conversation between Mr. Moore, himself and the son, "I took the contract away and advised with my attorneys about it, and they told me that they thought there could be no question about it, but what it would be in satisfaction of my debts to the bank. * * * Then I went back up and signed the contract and gave it to Mr. Moore. * * * I felt perfectly sure that Mr. Moore, when I signed it, thought I was paying all my indebtedness to the bank with that property if the bank accepted it." Mr. Elliott did not advise Mr. Moore of the attorney's view. He testifies that his son said, "I wouldn't sign it," and that Mr. Moore said: "I think that is the best thing your father can do because it releases his other property." Mr. Moore denies that he made the statement, admitting that it was possible that he might have remarked "It was the only way Mr. Elliott could get relief," saying in explanation that by the application of the proceeds from

sale of the mining equipment to the Elliott Coal Company and perhaps some of Mr. Elliott's indebtedness, the bank authorities would be appeased, and Mr. Elliott could sell his other properties privately, thus avoiding litigation and possible sacrifice.

The explanation seems reasonable when compared to the position taken by appellants.

The proof shows that at the time of the sale, Mr. Moore undertook to communicate with Mr. Elliott to advise with him about the sale, and application of proceeds, but Mr. Elliott was not in town. The next day Mr. Moore went to a hospital at Huntington, where he remained about three weeks. While there he wrote to the bank suggesting a request for a renewal of the balance of the notes. The bank officer saw Mr. Elliott later; told him to come to the bank, though the matter was not discussed because Mr. Elliott had other business, and "that was the only time he came to the bank by request, or at all, to discuss the matter."

Sometime after the sale a bank officer mentioned the matter to the son who told him that his father considered these notes were paid, and the officer later saw Mr. Elliott and told him he was surprised at the position he was taking. In the meantime Mr. Elliott did not appear to be concerned about the bank's releasing the mortgages, or returning to him the pledged securities, until the 2nd of October, 1937, when in writing he requested the return of the securities and notes, and release of liens.

It is in the proof that shortly after the sale, Mr. Elliott, in conversation with Mr. Justice, who was an endorser or surety on one of the Fannin notes, told Mr. Justice that he paid off his (Justice's) notes and had signed a writing which released him from all his obligations to the bank. Mr. Justice asked if Mr. Moore understood it that way, and Mr. Elliott replied: "I do not know whether Mr. Moore understood it that way or not." We do not find a contradiction of this statement.

The technical discussion here centers around the use of the words "any" and "for the purpose of satisfying" as used in the letter. Appellant would by interpolation have the clause read: "In full satisfaction of the indebtedness of the Elliott Mining Company, and all debts W. K. Elliott may owe the bank."

We cannot agree that the word "any" as used in relation to obligations due the bank by Mr. Elliott, was intended to mean *all* his obligations. We have examined most of the authorities cited by counsel in which courts have construed the word "any" and find that they are neither convincing, nor of persuasive influence. The word, it is true, in cases where legislative acts are involved, and where it is used in wills, has been construed to mean "all," but only where, from a reading of the act, or the document, the word "all" was necessary to be interpolated so as to carry out the intent.

In the case of Crummies Creek Coal Corporation v. Napier, 246 Ky. 569, 55 S. W. (2d) 339, 340, we had occasion to construe the word "any" as used in Section 4894, Kentucky Statutes. There was no contention there that the word meant "all." We said the word meant: "One indifferently out of a number; one indiscriminately of whatever kind or class; one, no matter what one." "Any" is an indefinite pronominal adjective, and is used to designate objects in a general way without pointing out any one in particular, Webster's International Dictionary. Webster's also gives another definition:

"Indicating a person, thing or event, * * * not a particular individual of the given category but whichever one chance may select; this, that or the other; one or another." It is not defined as including "all." See Sally v. Baker, 180 Ky. 833, 203 S. W. 724.

We need not go into a lengthy discussion as to the use of the words for the "purpose of satisfying our indebtedness to you." If the words used had been "in satisfaction" or "in full satisfaction," or in "discharge" of the indebtedness, there would be no doubt as to their meaning, and these words are generally used when a complete release from an obligation is intended. It may be admitted that the words "in satisfaction," or "satisfying," usually mean in full payment of an obligation. However, we are not to seize upon a particular word or phrase and construe a contract on that word or phrase. The word "purpose" and words "for the purpose" must be given some meaning, and we doubt not it was the "purpose" of the bank, not only to use the proceeds of the sale as far as they would go in paying the obligations, but it was likewise its purpose to collect all that it could on its entire indebtedness.

It is argued that it would appear unreasonable that any sensible man could or would have agreed to turn over the Elliott Company mining equipment, and entrust the sale of it to the bank, unless it was the understanding that it would wipe out the entire indebtedness. It appears to us that if there be any "unreasonableness" it would balance toward appellee's side. The proof is clear that the mining equipment was in bad condition and getting worse. It did not present a favorable character of security. From the proof adduced, it was sold at a fair and reasonable price; at least the chancellor justifiably so found.

Both Mr. Elliott and the bank officer who negotiated the trade (and there is no showing otherwise) must be assumed to be sensible, reasonable men. It can hardly be supposed that Mr. Moore, whose bank had mortgages and collateral which, according to appellants' estimates, were worth considerably more than the combined obligations, would agree to release these securities, and take in their stead mining equipment, which if not then to be classed as "junk" was rapidly reaching that stage, without any signs of betterment through the combined efforts of Mr. Elliott and the bank officers.

We have given this case careful consideration, due to the condition in which counsel says Mr. Elliott found himself after the transaction, but from the values he has placed on his properties and securities, he has fared very well. The bank reduced his indebtedness by a considerable amount when it could have applied all the proceeds of the sale to the Elliott Company's obligations.

Without intention to be critical, we may say that from all the proof in the case, the actions or failures to act, when action was necessary, do not lend weight to the contentions made, or positions taken by defendants. The weight of the proof, on material points and matters, is such as lead to the belief that the transaction throughout was consonant with appellee's version.

As we view the writing in the light of proof and circumstances shown by the record, all parties knew that the proceeds of the sale would not be sufficient to pay the debts of the Coal Company and all obligations of Mr. Elliott. It would be in the face of common reason to conclude that "there was mutual agreement" or understanding that the proceeds of sale would wipe out

all obligations for which **Mr. Elliott** was directly or secondarily liable.

We note by observation of a supplemental record filed after the original order of submission, that the debts due the bank by the Fannin Company have been fully discharged. This in no wise affects the matter under consideration, but lends color to the belief that the debtor did not place reliance on the chief defense interposed.

Judgment affirmed.