**UNITED STATES of America, Plaintiff,**

v.

**CONTINENTAL OIL COMPANY, Defendant.**

**Civ. No. 9763.**

United States District Court
W. D. Oklahoma.

Dec. 31, 1964.

B. Andrew Potter, U. S. Atty., Leonard L. Ralston, Asst. U. S. Atty., Oklahoma City, Okl., Russell Chapin, Chief, Gen. Claims Section Civil Div., Robert Mandel and Harry Crutcher III, Attys., Civil Div., Dept. of Justice, Washington, D. C., for plaintiff.

Mainard Kennerly, Tomerlin & High, Oklahoma City, Okl., L. David Trapnell, Ponca City, Okl., for defendant.

DAUGHERTY, District Judge.

█ This litigation involves the interpretation and construction of a written covenant in a quitclaim deed of land and improvements from the plaintiff, the United States of America, as grantor, to the defendant, Continental Oil Company, as grantee. The covenant reads as follows:

"Grantee covenants and agrees that in the event Grantee uses the facilities of the said Plancor 882 for extracting toluene from hydroformate within a period of eight (8) years from and after June 1, 1948, grantee shall and will pay an additional sum of Two Thousand Six Hundred Sixty-Five Dollars ($2,-665.00) per month for each month or part thereof that the facilities are used for that purpose, until the end of a period of eight (8) years from and after June 1, 1948."

During World War II the plaintiff built a plant at Ponca City, Oklahoma, known as Plancor 882 on land obtained from the defendant. In fact, the defendant built the plant or caused the same to be built for the plaintiff. At this time the defendant had a facility known as a Hydroformer at its Ponca City Refinery. This facility was patented

and licensed by the M. W. Kellogg Company and produced a substance called Hydroformate, which contained approximately six percent to thirteen percent of a substance known as Toluene. The purpose of building Plancor 882 at Ponca City was for it to receive the Hydroformate from the defendant's adjacent Hydroformer and by a distilling and extracting process in Plancor 882 obtain Toluene therefrom of approximately 99% purity which was to be used by the Government in making TNT. This ultimate use was shortly changed by the Government so as to obtain Toluene from Hydroformate of approximately 98% purity to be used as a blending agent in the production of aviation gasoline. During this period of time Plancor 882 was operated by defendant under an arrangement with plaintiff. At the end of World War II Plancor 882 was shut down as the requirement for aviation gas became greatly reduced.

Thereafter, the Government desired to dispose of Plancor 882 and the defendant was interested in buying the same but they could not reach an agreement on the sale figure. In essence, the Government was wanting to get as much of its cost back as it could and the defendant was not interested in such an elaborate plant designed to produce an end product for which the defendant had no marketing capability. Through negotiations a figure was finally agreed upon along with the above quoted covenant in the conveyance.

This controversy centers around the meaning and effect to be given to the technical words "Toluene" and "Hydroformate" as then used by the parties in the covenant in the quitclaim deed. Both parties in the negotiations and final arrangement had the benefit of their own technical experts in the petroleum field as well as attorneys.

All went well until the Korean War came on in 1950, and with it a greatly increased demand for aviation gasoline. To meet this demand the defendant entered the aviation gasoline field and for 13 months produced high purity toluene such as that produced during World War II from hydroformate from its hydroformer. The defendant paid the stipulated monthly sum during this period. The defendant apparently experienced some difficulty with Plancor 882 in the matter of getting the near pure toluene and as a result and by experimentation found that by using an end product from Plancor 882 which contained only from 80% to 85% Toluene and mixing the same with some richer blends it could meet the Government's specifications on aviation gasoline. The specification situation was somewhat different at this time inasmuch as during the operation during World War II the Government established required specifications on Toluene to be produced by the defendant from Plancor 882, whereas during the Korean War the only Government specifications which were involved pertained to aviation gasoline in its final form. Also the defendant found it was cheaper to operate Plancor 882 when only 80% to 85% Toluene was in the end product produced and furthermore it did not have to pay royalty to Shell Oil Company for the process. (No royalty was required by Shell for use of its patented process of extracting Toluene unless the end product contained more than 85% Toluene by weight). Also that a lower shipping rate by rail was available for the 80% to 85% product than the high purity Toluene. Then for 16 months the defendant instead of producing 98% pure Toluene, produced a substance containing only 80% to 85% Toluene, which it called aviation blending compound or abbreviated as ABC. Since the defendant did not consider that it was extracting Toluene during this 16 months period within the intent and meaning of the covenant, it refused to pay the monthly sum mentioned in the covenant.

In the meantime, the defendant replaced its Hydroformer producing Hydroformate with a Platformer producing Platformate. Platformate was substantially the same as Hydroformate but with some slight difference and particularly was cheaper and easier to produce

because a different type catalytic reformer (platinum for molybdenum) was used. Then for 25 months the defendant produced ABC from Platformate and took, and now takes, the position herein that it was not extracting Toluene from Hydroformate within the intent and meaning of the covenant and refused to pay the said monthly sum for this period.

To the contrary, it appears to be the plaintiff's position that since the defendant upon the advent of the Korean War used practically all of Plancor 882 including the extractive tower, used the end product therefrom for aviation gasoline blending and because Hydroformate and Platformate are substantially the same that defendant should pay the monthly sum for the entire 41 months period.

The Court is thus faced with a determination of what the parties meant when they used the terms "Toluene" and "Hydroformate" and if the use of Plancor 882 by the defendant during the 41 months period or any part thereof is fairly within such meaning so as to require the additional monthly sum.

Since the words "Toluene" and "Hydroformate" are highly technical terms both sides introduced much expert evidence. From this evidence the Court finds that Toluene has never been produced in 100% pure state even though this may be academically possible; the Eastman Kodak Company has used an extra high purity Toluene; nitration grade Toluene for TNT is 99% pure or better; industrial grade Toluene suitable for aviation gasoline blending and perhaps other uses is 98% pure or better, and commercial grade Toluene is 96% pure or better. This latter grade had certain recognized industrial uses in connection with synthetics, paints and other items. Other than these grades in industrial use and in keeping with specifications pertaining to each, it does not appear that anything containing less than 96% Toluene was called or regarded as Toluene in usage and custom in industry but was generally known and accepted under a variety of other names, usually trade names. It also appears that in the railroad industry and under tariffs pertaining thereto only high purity Toluene of 96% or better, that is commercial grade or better, called for a higher shipping rate than did any substance which might have contained Toluene in lesser percentages than commercial grade or 96% pure or above. Furthermore, under import tariffs set by the Federal Government high purity Toluene under that name was duty free but any substances which might have contained Toluene in lesser percentages than 96% or commercial grade would be charged a duty on importation. It therefore appears quite definite to the Court that when the parties entered into the covenant involved herein the word "Toluene" had a generally accepted meaning as to its specifications which called for a certain purity of Toluene in this country in the petroleum world, in industry in general, under railroad tariffs and under import tariffs to the effect that before a substance was called or entitled to be called "Toluene" as such, it had to be of high purity and meaning at least 96% purity in Toluene or commercial grade or above per specifications. Anything less than this simply was not known or regarded as Toluene but was treated as something else depending upon the use and was and could be called a variety of other things. It also appears that nothing like or resembling ABC had been generally produced or used in the industry for aviation gas blending. The Government's own specification for Toluene for aviation gasoline blending during World War II was 98% pure or better and nothing below was acceptable by the Government under its specifications for and under the name of Toluene. It would seem that the parties here chose the technical term "Toluene" which denoted commercial grade by specification or better by industrial use and custom. Had the Government wanted to call for the extra monthly rental when all the plant was used or the extracting tower was used or when the end product from the plant was used as a blending agent for aviation

gasoline, it could have done so by using such appropriate language and make the meaning quite clear. However, the parties chose to use the technical term "Toluene" and it seems should therefore be bound by its generally accepted and understood meaning and treatment in the industrial and governmental world at the time.

A more difficult problem is encountered in determining the meaning and effect given the technical word "Hydroformate." This is because "Platformate" is substantially the same as Hydroformate, even though differently produced, easier produced, and cheaper to produce, whereas, ABC is significantly different from Toluene as above pointed out. In a technical sense, it could be said that Platformate is not Hydroformate due to the different process utilized in production, and perhaps because a Platformer and Platformate were not known or in being until after the parties entered into the covenant here involved. To offset this would be to consider the facts that the end product is the same or substantially the same, and that both terms are trade names. Also the position that "Hydroformate" had become a generic term covering any catalytic reformate which would include Platformate. All circumstances probably require that a technical approach should be adopted and Platformate be deemed not to be Hydroformate within the meaning and intent of the covenant and the Court will so hold. In this connection, it is well to note that there is nothing illegal or wrong with a business organization adopting new processes and facilities and thereby lessening production costs, reducing shipping expenses, eliminating royalty payments, and even contract obligations such as we have involved in this litigation. At any rate, since the Court finds that Toluene was not extracted within the meaning and intent of that term as used by the parties, the problem about Platformate not being Hydroformate is reduced to little or no importance.

In reaching the findings and conclusions made herein, the Court follows those rules of law deemed applicable which provide that to interpret words used in an agreement is to ascertain the meaning to be given such words, Restatement of the Law of Contracts, Section 226; technical terms are given their technical meaning unless the context or a usage which is applicable indicates a different meaning, Restatement of the Law of Contracts, Section 235(b); Title 15 Oklahoma Statutes, Annotated, Section 161; in dealing with contracts involving a subject matter or terms of a technical nature the circumstances surrounding the making of a contract should be considered in interpreting the terms and words used, Title 15, Oklahoma Statutes Annotated, Section 163, Templeman v. Walker, 175 Okl. 366, 52 P.2d 737; Prowant v. Sealy, 77 Okl. 244, 187 P. 235; when difficulty is encountered in satisfactorily interpreting the terms of a contract, it is permissible to examine other contracts between the parties in respect to the same subject matter in aid of a proper interpretation of the contract involved, 12 Am.Jur., Contracts, Section 246; a restriction in a deed should not be enlarged or extended by construction beyond the clear meaning of its terms even to accomplish what it may be thought the parties would have desired had a situation which later developed been foreseen by them at the time the restriction was written, 26 C.J.S. Deeds § 163, pages 517–518, and the exception to the general rule that a writing is construed most strongly against the draftsman when the words involved are the common language of both parties or the contract is the joint effort of the attorneys and technicians for both sides; Schultz v. Kneidl, 56 N.J.Super. 575, 153 A.2d 779; Elliott v. Pikeville National Bank and Trust Company, 278 Ky. 325, 128 S.W.2d 756; Carter v. Certain-Teed Products Corp. (C.C.A.–8), 200 F.2d 754, Bee Bldg. Co. v. Peters Trust Company, 106 Neb. 294, 183 N.W. 302, and Beck v. F. W. Woolworth Co. (USDC–ND Iowa), 111 F.Supp. 824.

Accordingly, the defendant should prevail herein and the plaintiff should recover nothing under its complaint herein. Counsel for defendant will prepare an appropriate judgment based upon this memorandum opinion and present the same to the Court for signature and filing herein.