NOT RECOMMENDED FOR PUBLICATION
File Name: 23a0194n.06

No. 22-5581

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED

Apr 26, 2023
DEBORAH S. HUNT, Clerk

|  |  |  |
|---|---|---|
| CENTRAL JERSEY CONSTRUCTION EQUIPMENT SALES, LLC, | ) ) ) | |
| Plaintiff-Appellant, | ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF KENTUCKY |
| v. | ) ) ) | |
| LBX COMPANY, LLC, | ) | |
| Defendant-Appellee. | ) ) | OPINION |

Before: STRANCH, MURPHY, and DAVIS, Circuit Judges.

MURPHY, Circuit Judge. Central Jersey Construction Equipment Sales contracted with LBX Company to become a dealer of LBX's construction equipment. According to Central's complaint, LBX later asked it to open an additional facility and promised a new dealer agreement if it obliged. Central invested in a costly expansion but never got the promised contract. LBX instead terminated the parties' existing agreement a few years later. Central claims that LBX's conduct violated a Kentucky law that requires a manufacturer to have "good cause" to terminate a contract with a retailer. Central also raises a promissory-estoppel claim, asserting that it opened the additional location in reliance on LBX's unfulfilled promise of a new agreement.

The district court properly dismissed both claims. As for its statutory claim, the parties' existing agreement gave Central one year to file "any action" "pertaining to" the agreement. Yet Central waited over a year before suing under the Kentucky law that required "good cause" for its

termination. This statutory claim "pertains to" (that is, has a connection with) the agreement because the claim would not exist without it. Central also gives us no reason to conclude that Kentucky courts would refuse to enforce this contractual time limit. As for Central's promissory-estoppel claim, we predict that the Kentucky Supreme Court would enforce only definite promises in promissory-estoppel cases—just as it does in contract cases. And the abstract promise of a future "agreement" without reference to any of its terms does not suffice. We thus affirm.

I

We must accept the well-pleaded allegations in Central's complaint at this stage. *See Rudd v. City of Norton Shores*, 977 F.3d 503, 511 (6th Cir. 2020). LBX, a company located in Kentucky, manufactures excavators and other large construction equipment using the Link-Belt name. To sell this equipment, it relies on authorized dealers.

Central, a New Jersey company, became an LBX dealer in 2005. LBX's "Dealer Agreement" governed their relationship. Agreement, R.38-1, PageID 354. This Dealer Agreement allowed Central to sell LBX's equipment in six and a half counties in central and southern New Jersey, including Middlesex County. *Id.*, PageID 355. The Agreement dated to a time when the law barred a manufacturer from setting the minimum prices at which its dealers could sell its products. So the Agreement instead prohibited Central from competing with LBX's other dealers outside Central's territory. *Id.*; *cf. Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 903–04 (2007). The Agreement also required Central to sell LBX's equipment under Central's name but to inform customers that the equipment had been "furnished by" LBX. Agreement, R.38, PageID 361. And it required Central to place LBX signs at "all approved facilities." *Id.*, PageID 357.

The Agreement initially expired on August 31, 2006. *Id.*, PageID 366. But it would "automatically" renew "for additional one (1) year terms" if the parties took no action to end their relationship. *Id.* To terminate the Agreement at the close of any annual term, a party had to give notice at least 30 days in advance that the party did not intend to renew it. *Id.*

For several years, the parties automatically renewed the Agreement and had a mutually beneficial relationship under its terms. In late 2011, LBX asked Central to begin serving customers "in the North Jersey market[.]" Am. Compl., R.38, PageID 347. LBX requested that Central open another location in either Staten Island, New York (which was outside its territory) or Middlesex County (which was inside it). *Id.*; *see* Agreement, R.38-1, PageID 355. If Central chose to open this facility, LBX promised it a new dealership agreement.

At first, Central opened a Staten Island facility. But this location did not succeed because of the high costs and logistical problems on the island. At LBX's urging, Central looked for land to operate another facility in Middlesex County. In 2016, it found a suitable spot. Central spent substantial sums renovating the buildings at this location, adding "LBX" signs and a "custom designed model of an excavator" out front. Am. Compl., R.38, PageID 348.

Throughout this time, Central kept asking LBX for a new dealership agreement that would include an expanded North Jersey territory. LBX's dealer development manager repeatedly promised this new agreement, stating that the parties had a "good" relationship. *Id.* In March 2017, LBX executives also promised a new agreement to Central executives at a Las Vegas trade show. Central renewed its request for the new agreement over the next several months. Yet LBX executives did not provide one and told Central to continue "business as usual[.]" *Id.*

Some two years later, the parties still did not have a new agreement. In August 2019, moreover, LBX told Central that it would not renew the Dealer Agreement and that the Agreement

3

would expire on August 31. Central alleges that it had been performing admirably up to this time and that LBX gave no reason for the termination. Central later learned that LBX had been negotiating with another dealer to operate a Staten Island dealership. Central adds that it made costly investments branding its business with LBX logos in reliance on LBX's promise of a new agreement that never came.

On October 1, 2020, Central sued LBX in a New Jersey court. (LBX suggests that Central did not sue until November 3, but the difference in dates does not matter now.) LBX removed this suit to federal court and successfully moved to transfer it to a Kentucky district court under the Dealer Agreement's forum-selection clause. Central then amended its complaint to assert two claims—one under a Kentucky law governing "retail agreement contracts" and the other for promissory estoppel under Kentucky common law.

The district court dismissed Central's complaint at the motion-to-dismiss stage. *See Cent. Jersey Constr. Equip. Sales, LLC v. LBX Co., LLC*, 2022 WL 2161482, at *7 (E.D. Ky. June 15, 2022). Under the Dealer Agreement's terms, Central had one year to file any suit on a claim "pertaining to" the Agreement. The district court held that this limit barred Central's claim that LBX improperly terminated the Agreement under the law governing retail agreement contracts. *Id.* at *4–6. The court next held that Central did not plausibly plead a promissory-estoppel claim. *See id.* at *6–7. We review its dismissal order de novo. *See Ryan P. Estes, D.M.D., M.S., P.S.C. v. Cincinnati Ins. Co.*, 23 F.4th 695, 699 (6th Cir. 2022).

II

Even though Central sold LBX's equipment in New Jersey, the parties agree that Kentucky law governed their relationship. We thus may assume the point. *See Masco Corp. v. Wojcik*, 795

F. App'x 424, 427 (6th Cir. 2019). On appeal, Central argues that the district court wrongly found its statutory claim untimely and wrongly held that it failed to plead a promissory-estoppel claim.

## A. Kentucky Law on Retail Agreement Contracts

Central first asserts that the district court mistakenly applied the Dealer Agreement's one-year limitations period to its claim under the Kentucky law governing "retail agreement contracts." *See* Ky. Rev. Stat. §§ 365.800–.840. Central sought to enforce a section of this law that bars a manufacturer from ending "a retail agreement contract without good cause." *Id.* § 365.831(1). This section identifies several specific reasons that would give a manufacturer "good cause" to fire a dealer, including the dealer's dissolution, its default on a loan, or its failure to operate for a certain time. *Id.* § 365.831(1)(a)–(f). The section alternatively allows the manufacturer to treat the dealer's violation of a contractual requirement as "good cause" so long as the manufacturer imposes that requirement on similarly situated retailers. *Id.* § 365.831(1). If, however, the manufacturer terminates the agreement due to a retailer's breach of one of its requirements, it must give the retailer 90 days' notice of termination and 60 days to cure the breach. *Id.* § 365.831(4).

At the outset, we highlight two issues about this Kentucky law that we do not decide on appeal. The law's good-cause section does not itself contain a cause of action allowing retailers to sue. Central nevertheless argued in the district court that it may enforce the section under a different law that provides a generic cause of action for "[a] person injured by the violation of any statute[.]" *Id.* § 446.070; *Hickey v. Gen. Elec. Co.*, 539 S.W.3d 19, 23–24 (Ky. 2018). Like the district court, we may avoid this issue. *See Cent. Jersey*, 2022 WL 2161482, at *4. Next, the Kentucky law elsewhere requires a manufacturer to repurchase a dealer's inventory after a termination. Ky. Rev. Stat. §§ 365.805, .825. Central raised a separate claim under this inventory section. But the district court rejected the claim, and Central did not reassert it on appeal.

This appeal instead turns on whether the Dealer Agreement's one-year time limit barred any claim that Central might have pursued under the Kentucky law's good-cause section. The Dealer Agreement stated: "Except for any indebtedness of [Central] to [LBX] or security related thereto, any action by [LBX] or [Central] pertaining to this Agreement must be instituted within one year after the accrual of the claim upon which such action is based." Agreement, R.38-1, PageID 364. Central admits that it did not sue over LBX's termination within a year. But it argues that this time limit does not apply here. Its arguments require us to answer two questions.

*Question 1: Does the Dealer Agreement cover Central's claim under the Kentucky good-cause section?* Central initially asserts that the language of the Dealer Agreement's limitations period applies only to breach-of-contract actions, not to the statutory action that it seeks to litigate. We disagree. Central's statutory claim falls comfortably within that language.

This question, at bottom, concerns the meaning of the Dealer Agreement. The question thus triggers Kentucky's common-law rules for interpreting contracts. Like most courts, Kentucky courts start with a contract's language. *See Mostert v. Mostert Grp., LLC*, 606 S.W.3d 87, 91 (Ky. 2020). They enforce a contract's unambiguous language according to its ordinary meaning. *See Hazard Coal Corp. v. Knight*, 325 S.W.3d 290, 298 (Ky. 2010). They also treat a contract's language as unambiguous whenever a "reasonable person" would conclude that it is susceptible to only one interpretation. *Mostert*, 606 S.W.3d at 91 (quoting *Ky. Shakespeare Festival, Inc. v. Dunaway*, 490 S.W.3d 691, 694–95 (Ky. 2016)).

Here, any reasonable person would read the Dealer Agreement's limitations period to have a clear (and clearly broad) meaning. That contract term applies to "any action . . . pertaining to this Agreement." Agreement, R.38-1, PageID 364. Contrary to Central's claim, both the adjective "any" and the phrasal verb "pertain to" unambiguously reach more than breach-of-contract actions.

6

As for the word "any," courts have long recognized that it has an "expansive" reach. *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 219 (2008) (quoting *United States v. Gonzales*, 520 U.S. 1, 5 (1997)). That adjective means "indiscriminately of whatever kind or class[.]" *Commonwealth ex rel. Brown v. Stars Interactive Holdings (IOM) Ltd.*, 617 S.W.3d 792, 799 (Ky. 2020) (quoting *Elliott v. Pikeville Nat'l Bank & Tr. Co.*, 128 S.W.2d 756, 761 (Ky. 1939)); *see Gonzales*, 520 U.S. at 5 (quoting *Webster's Third New International Dictionary* 97 (1976)) (same). The ordinary meaning of "any action," then, covers a suit "of whatever kind," not just a breach-of-contract suit. *Brown*, 617 S.W.3d at 799 (quoting *Elliott*, 128 S.W.2d at 761). Absent limiting language elsewhere in the Dealer Agreement, that phrase reaches Central's claim to enforce the Kentucky law.

As for the phrase "pertaining to," it is similarly expansive. The phrase means "to relate to someone or something" or "to have something to do with someone or something." *McGraw Hill's Dictionary of American Idioms and Phrasal Verbs* 497 (Richard A. Spears, ed., 2004). Like its synonym "relating to," this phrase covers any action "connected with" the Dealer Agreement. *Webster's New International Dictionary* 1829 (2d ed. 1934); *cf. Cal. Div. of Lab. Standards Enf't v. Dillingham Constr., N.A., Inc.*, 519 U.S. 316, 324 (1997).

Central's claim under the Kentucky law's good-cause section has this connection. Indeed, the claim *depends on* the Agreement. To show a violation of this section, a dealer (like Central) must identify a "retail agreement contract" (like the Dealer Agreement) with a supplier (like LBX). Ky. Rev. Stat. § 365.831(1). After all, LBX could not have terminated the Agreement "without good cause" unless the Agreement existed. *Id.* And any "reasonable person" would say that a claim relates to the Agreement if it could not exist without the Agreement. *Mostert*, 606 S.W.3d at 91 (citation omitted). So the Agreement's one-year time limit unambiguously applies here.

Two caselaw-inspired analogies confirm our point. Suppose that an arbitration clause in a contract compelled the parties to arbitrate "any claims . . . pertaining to" the contract. *N. Fork Collieries, LLC v. Hall*, 322 S.W.3d 98, 104–05 (Ky. 2010). Suppose further that one party sued the other for breaching a *second* contract that lacked a similar arbitration provision. *See id.* at 101. Yet suppose that the two contracts were so interrelated that a court could rule for the plaintiff on this claim only by finding that the defendant had breached the *first* contract. *See id.* at 103. An ordinary person would say that this claim "pertains to" the first contract because it is "founded on" that contract—even if technically asserting a breach of a related one. *Id.* at 105. In the same way, the Dealer Agreement is "the foundation" for Central's statutory claim. *Id.* at 104.

Or suppose that a contract's forum-selection clause compelled the parties to bring claims "pertaining to" the contract in a specific venue. *Worley v. Celebrate the Child. Int'l, Inc.*, 2016 WL 6777899, at *1 (E.D. Mo. Nov. 16, 2016). Suppose further that one party sued the other "in tort" rather than "contract." *Id.* at *3. Yet suppose that its tort claims relied on the contract by alleging that the defendant's tort duties sprang from its contractual duties. *Id.* at *4. An ordinary person would say that the tort claims "pertain to" the contract because they are based on it. *Id.* In the same way, Central's statutory claim "undoubtedly arose from" the Dealer Agreement. *Id.*

Central responds that its statutory claim is "independent" of its Agreement. Appellant's Br. 19. We do not see why. The Agreement is the but-for cause of the claim. *See Burrage v. United States*, 571 U.S. 204, 210–11 (2014). If the Agreement did not exist, the claim could not. Because the claim is dependent on the Agreement, it triggers its one-year limitations period.

*Question 2: Is the Dealer Agreement's limitations period enforceable?* Central next offers three reasons why Kentucky law nonetheless bars us from enforcing the Dealer Agreement's one-year limitations period as against Central's statutory claim. Each reason lacks merit.

*First*, although the Kentucky law that Central seeks to enforce has no specific statute of limitations, Kentucky's general statute of limitations gives plaintiffs five years to bring "[a]n action upon a liability created by statute, when no other time is fixed by the statute creating the liability." Ky. Rev. Stat. § 413.120(2). Central asserts that this statutory limitations period automatically trumps the Agreement's contractual limitations period. This argument has things backwards. Kentucky courts generally permit parties to contract for a (reasonable) time limit that is shorter than the one that would otherwise apply under a Kentucky law. *See State Farm Mut. Auto. Ins. Co. v. Riggs*, 484 S.W.3d 724, 727–28 (Ky. 2016); *Turner v. Cal. Ins. Co.*, 254 S.W.2d 481, 483 (Ky. 1953); *Breathitt v. Gorman*, 2018 WL 1568971, at *3 (Ky. Ct. App. Mar. 30, 2018).

In response, Central does not try to distinguish these cases. It instead relies on federal cases interpreting the Employee Retirement Income Security Act. *See Redmon v. Sud-Chemie Inc. Ret. Plan for Union Emps.*, 547 F.3d 531, 534–35 (6th Cir. 2008). This act lacks a statute of limitations, so we have read it to adopt the most analogous state statute of limitations. *See id.* But our reading of federal law says nothing about whether Kentucky courts permit contracting parties to shorten the state statute of limitations governing a state-law claim.

*Second*, the Kentucky law that Central seeks to enforce prohibits parties from "waiving" its protections: "The provisions of [Kentucky Revised Statutes] 365.800 to 365.840 shall represent a public policy of this Commonwealth and shall not be waivable in any retail agreement contract, and any attempted waiver shall be void." Ky. Rev. Stat. § 365.834. According to Central, this section prohibits parties from waiving the five-year statute of limitations. Central misreads its text. That text prohibits parties from waiving the protections in the Kentucky law *itself* (those in §§ 365.800 through 365.840). The text does not prohibit parties from waiving provisions found *elsewhere*—like the generic statute of limitations in § 413.120(2). And if Central claims that a

9

shortened statute of limitations "waives" the Kentucky law's *substantive* protections in §§ 365.800 to 365.840, it is mistaken. Like an arbitration clause, a (reasonably) shortened statute of limitations merely changes the *procedure* to enforce those substantive protections. It does not "waive" them. *Cf. Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 26 (1991).

*Third*, Central points out that Kentucky courts will not enforce contractual time limits that are unreasonably short. *See State Farm*, 484 S.W.3d at 727; *Webb v. Ky. Farm Bureau Ins. Co.*, 577 S.W.2d 17, 19 (Ky. Ct. App. 1978). The Kentucky Supreme Court has yet to adopt a definitive test to decide whether a contractual time limit is reasonable. *Compare Croghan v. Norton Healthcare, Inc.*, 613 S.W.3d 37, 43 (Ky. Ct. App. 2020), *with Hale v. Blue Cross and Blue Shield of Ky., Inc.*, 862 S.W.2d 905, 907 (Ky. Ct. App. 1993). But Kentucky courts generally focus on whether the time limit leaves a would-be plaintiff enough time to discover and bring a claim. *See, e.g.*, *Riggs*, 484 S.W.3d at 727–28; *Hale*, 862 S.W.2d at 907. Under this test, they have often upheld contractual one-year time limits. *See Webb*, 577 S.W.2d at 19; *see also Wood v. State Farm Fire and Cas. Co.*, 2020 WL 1898401, at *3 (Ky. Ct. App. Apr. 17, 2020); *Robinette v. Venn*, 2004 WL 1909456, at *2 (Ky. Ct. App. Aug. 27, 2004); *Hale*, 862 S.W.2d at 907.

Here, Central offers no reasons why we should find the Dealer Agreement's similar one-year limit unreasonable. Central's statutory claim concerns LBX's termination of the Agreement. Central allegedly learned of LBX's decision through a letter that LBX sent a month before the termination date. Am. Compl., Ex. B, R.38-2, PageID 372. Central thus knew of the termination when it occurred. *Id.* It also knew that LBX did not identify a "good cause" for the termination, as the good-cause section requires. Am. Compl., R.38, PageID 348; Ky. Rev. Stat. § 365.831(4). Central's own allegations thus suggest that it had all the information it needed to pursue its claim within a year. For an unknown reason, however, it waited over a year to sue.

Yet we need not conclusively decide the time limit's reasonableness. On appeal, Central argues only that the district court committed a procedural mistake. Central suggests that the court could not enforce the Agreement's time limit at the motion-to-dismiss stage and should have allowed it to take discovery on this reasonableness issue. Central is correct that LBX's timeliness argument represents an affirmative defense. So a plaintiff need not plead facts that show that the suit is *timely*. *See Cataldo v. U.S. Steel Corp.*, 676 F.3d 542, 547 (6th Cir. 2012). But a district court may accept a limitations defense at the pleading stage if the plaintiff pleads facts, as Central did, that establish that the suit is *untimely*. *Id.* We have thus upheld a decision to dismiss a claim based on a contractual time limit when the complaint's allegations established that the limit was reasonable. *See Pike v. Gov. Emps. Ins. Co.*, 174 F. App'x 311, 316 (6th Cir. 2006). The complaint's allegations here likewise "show" that the Agreement's one-year limit was reasonable. *Cataldo*, 676 F.3d at 547. Central's assertion that it received the deficient notice before the Agreement expired evinces its ability to discover its claim within the prescribed one-year period. *See Riggs*, 484 S.W.3d at 727–28; *Hale*, 862 S.W.2d at 907. Moreover, Central's briefs in this court and below explain neither how the limit is unreasonable nor how discovery would help Central show that it is. Central merely claims an absolute right to discovery. It is wrong. The district court correctly resolved the limitations issue now because Central's complaint shows that it had the information necessary to pursue its claim within one year and that it did not do so.

## B. Kentucky Promissory-Estoppel Law

Central next alleges that the district court wrongly dismissed its promissory-estoppel claim. Like most states, Kentucky follows the approach to promissory estoppel laid out in the Restatement of Contracts. *See Sawyer v. Mills*, 295 S.W.3d 79, 89 (Ky. 2009); *see also Bisig v. Time Warner Cable, Inc.*, 940 F.3d 205, 215 (6th Cir. 2019). This approach has four elements. A defendant

must have made a "promise" to a plaintiff. Restatement (Second) of Contracts § 90(1) (Am. L. Inst. 1981). The promise must be of such a kind that the promisor would "reasonably expect" it to "induce" the plaintiff to take (or forgo) some "action." *Id.* The plaintiff must take (or forgo) this action. *Id.* And a judicial refusal to enforce the promise must create an "injustice." *Id.*

The district court held that Central's complaint failed to plausibly plead multiple elements. *See Cent. Jersey*, 2022 WL 2161482, at *6–7. But we can affirm based solely on the "promise" element. Common-law courts have long disagreed over how clear a "promise" must be to support a promissory-estoppel claim. *See* 3 *Corbin on Contracts* § 8.11, Lexis (database updated 2022); 4 *Williston on Contracts* § 8:7 (4th ed.), Westlaw (database updated May 2022). This debate boils down to the nature of promissory estoppel. Is it a narrow contract-like doctrine designed to show that the promisor *consented* to be bound? Or is it a broad tort-like doctrine designed to *coerce* a "careless" promisor to pay for the cost of a promisee's reliance despite the promisor's lack of consent? Douglas G. Baird, *Unlikely Resurrection: Richard Posner, Promissory Estoppel, and the Death of Contract*, 86 U. Chi. L. Rev. 1037, 1037–44 (2019).

Taking the contract side, some courts (like Michigan's) require a "'clear and definite' promise." *Avertest, LLC v. Livingston County*, 2021 WL 3702196, at *6 (6th Cir. Aug. 20, 2021) (quoting *State Bank of Standish v. Curry*, 500 N.W.2d 104, 108 (Mich. 1993)). These courts treat the claim's "reliance" element (that a plaintiff take or forgo an act) as a substitute for contract law's traditional "consideration" element. *Garwood Packaging, Inc. v. Allen & Co.*, 378 F.3d 698, 702 (7th Cir. 2004). Just as a promisee's "consideration" historically provided good evidence that a promisor made a commitment, *see* Oliver Wendell Holmes, Jr., *The Common Law* 258–59 (1881), so too can a promisee's detrimental change in position (its reliance) provide the same useful evidence, *see Garwood*, 378 F.3d at 702. Apart from this change, these courts largely

incorporate contract law's other elements into a promissory-estoppel claim. *See State Bank*, 500 N.W.2d at 109. So just as a contractual "offer" must be "clear, definite, and unambiguous" to create a contract, the courts require a promise to have similar clarity to support a promissory-estoppel claim. Michael B. Metzger & Michael J. Phillips, *The Emergence of Promissory Estoppel as an Independent Theory of Recovery*, 35 Rutgers L. Rev. 472, 495–96, 538 (1983). Because this rule provides easy-to-understand guidance on when the judiciary will enforce naked promises, it enhances the "contractual freedom" of the negotiating parties. *State Bank*, 500 N.W.2d at 109.

Taking the tort side, other courts (like Wisconsin's) have rejected the notion that the promise underlying a promissory-estoppel claim must be "so definite" as to equate to a contract offer. *Hoffman v. Red Owl Stores, Inc.*, 133 N.W.2d 267, 275 (Wis. 1965); *see First Nat'l Bank of Logansport v. Logan Mfg. Co.*, 577 N.E.2d 949, 954 (Ind. 1991). These courts treat promissory estoppel as a cause of action wholly distinct from breach of contract. *See Corbin*, *supra*, § 8.11[III]–[IV]. They place less emphasis on maximizing the parties' bargaining freedom and more on remedying a promisee's injury caused by its reasonable "reliance" on a negligent promise. *Id.* § 8.11[III]. By rendering more promises potentially actionable, this murkier test focuses more on the "injustice" element and allows for "fluidity" across cases. *Hoffman*, 133 N.W.2d at 275. It thus gives courts more "discretion to do the right thing" case-by-case. Baird, *supra*, at 1041–42.

As a court sitting in diversity, we must predict how the Kentucky Supreme Court would come down on this debate. *See Estes*, 23 F.4th at 699. That court has a "paucity" of promissory-estoppel decisions. *Corbin*, *supra*, § 8.12; *see Sawyer*, 295 S.W.3d at 89–91. But courts applying Kentucky law have "narrowly confined" the doctrine. *Davis v. Siemens Med. Sols. USA, Inc.*, 399 F. Supp. 2d 785, 797 (W.D. Ky. 2005); *see Rivermont Inn, Inc. v. Bass Hotel & Resorts, Inc.*, 113 S.W.3d 636, 642–43 (Ky. Ct. App. 2003); *McCarthy v. Louisville Cartage Co., Inc.*, 796 S.W.2d

10, 12 (Ky. Ct. App. 1990). One Kentucky court has described promissory estoppel as essentially allowing a promisee's reliance to serve as a "substitute" for the consideration that a contract requires. *McCarthy*, 796 S.W.2d at 12. A well-known treatise, though noting the difficulty of drawing "precise" lines, also numbers Kentucky among the states that take a contract-rooted view of promissory estoppel. Corbin, *supra*, § 8.11 n.42. Under this contract-rooted view, we and other courts have read Kentucky law to require a "clear, definite, and unambiguous" promise—just as a contract offer would require. *Be Well Providers, LLC v. Anthem Health Plans of Ky., Inc.*, 580 F. Supp. 3d 477, 488 & n.11 (W.D. Ky. 2022); *see Gati v. W. Ky. Univ.*, 762 F. App'x 246, 254 (6th Cir. 2019); *Hesco Parts Corp. LLC v. Ford Motor Co.*, 377 F. App'x 445, 447 (6th Cir. 2010).

This reading of Kentucky law dooms Central's promissory-estoppel claim. Nobody would describe LBX's alleged promises as "clear, definite, and unambiguous." *Be Well Providers*, 580 F. Supp. 3d at 488. According to Central's complaint, LBX promised Central that it would enter into a "new Dealer Agreement" that included an "expanded territory" if Central opened a new facility. Am. Compl., R.38, PageID 347, 348. But Central does not identify the terms of this future "agreement." How long would it last? Did it contain the one-year time limit to sue? What was the size of the "expanded" territory? Was that territory exclusive? We do not know the answers to any of these questions because the complaint alleges generic promises of an "agreement" alone. But, as we said in an Ohio case, the promise of a generic future agreement with many missing terms is not "definite enough to be enforced" using promissory estoppel. *Arett v. Gardens Alive Farms LLC*, 2022 WL 1024626, at *4 (6th Cir. Apr. 6, 2022).

The contrary conclusion would allow Central "to get around" a well-established limit in Kentucky contract law. *Sawyers*, 295 S.W.3d at 90. Kentucky's highest court has refused to enforce a generic "agreement to agree" under Kentucky law if that agreement does not contain the

14

essential elements of the future agreement. *See Walker v. Keith*, 382 S.W.2d 198, 201 (Ky. 1964). So, unlike other states, Kentucky follows an "all or nothing" approach to preliminary agreements. *Giverny Gardens, L.P. v. Columbia Hous. Partners, L.P.*, 147 F. App'x 443, 446 (6th Cir. 2005) (quoting *Burbach Broad. Co. of Del. v. Elkins Radio Corp.*, 278 F.3d 401, 409 n.7 (4th Cir. 2002)). It treats these agreements either as enforceable contracts laying out all material terms or else as unenforceable statements of intention that lack some of those terms. *See id.* at 445–50; *Cinelli v. Ward*, 997 S.W.2d 474, 478 (Ky. Ct. App. 1998).

Applying this principle here, Kentucky courts would reject the claim that LBX's promise of a new agreement amounted to a binding contract "offer." That generic promise lacked the essential elements of the deal. *See Walker*, 382 S.W.2d at 201. Yet we would render this contract-law principle a dead letter if we enforced LBX's promised "agreement" by changing the label from "breach of contract" to "promissory estoppel." If two parties' actual *agreement* to agree is not enforceable, why would one party's mere *promise* to agree be enforceable? We predict that the Kentucky Supreme Court would treat both an agreement to agree (for a contract claim) and a promise to agree (for this promissory-estoppel claim) in the same way: as too indefinite. *Cf. Arett*, 2022 WL 1024626, at *4. Indeed, that court has already expressed hesitancy to adopt a broad view of promissory estoppel that would eliminate other contract-law limitations, such as the statute of frauds. *See Sawyers*, 295 S.W.3d at 90.

In response, Central raises a legal argument and a factual one. Legally, Central invokes precedent suggesting that, although "agreements to agree" may not create enforceable contracts, they can create enforceable promissory-estoppel claims. But Central cites cases from places like Wisconsin that take a broader view of promissory estoppel. *See Hoffman*, 133 N.W.2d at 275.

The relevant Kentucky cases signal that Kentucky "narrowly" applies the doctrine. *Davis*, 399 F. Supp. 2d at 797. So these out-of-state authorities do Central no good.

Factually, Central suggests in its reply brief that LBX's promised new agreement contained all the same terms as its existing Dealer Agreement but with an expanded territory. Yet its complaint lacked these factual suggestions. And Central cannot amend the complaint in a reply brief on appeal. *Cf. Bates v. Green Farms Condo. Ass'n.*, 958 F.3d 470, 483–84 (6th Cir. 2020). Besides, even if LBX had proposed these alleged terms, Central then would have received what LBX promised. It alleges that the parties renewed the same Dealer Agreement in the years after LBX's last alleged promise and that LBX allowed it to operate in an expanded territory despite the Dealer Agreement's territorial limits. In addition, the Dealer Agreement's existing terms included the one-year time limit on litigation that Central did not satisfy. We do not believe that the Kentucky Supreme Court would allow Central to use promissory estoppel to sidestep both traditional Kentucky limits on contract law and the parties' own limits in their Agreement.

We affirm.