**L.K. COMSTOCK & COMPANY, INC., Plaintiff,**

v.

**BECON CONSTRUCTION COMPANY, Defendant.**

**Civil Action No. 89–61.**

United States District Court, E.D. Kentucky.

April 25, 1994.

William H. McCann, Wyatt, Tarrant & Combs, Lexington, Kentucky, Harry L. Griffin, Jr., Frank M. Crittenden, John D. Marshall, Jr., Griffin, Cochrane & Marshall, Atlanta, GA, for Plaintiff.

V. Thomas Fryman, Jr., Michael C. Slone, Greenebaum, Doll & McDonald P.L.L.C., Lexington, Kentucky, for Defendant.

### MEMORANDUM OPINION AND ORDER

WILHOIT, District Judge.

#### I.

This matter is before the Court on the motion of L.K. Comstock & Company, Inc.

(Comstock) to confirm Special Master's Findings of Fact and Conclusions of Law. Becon Construction Company (Becon) opposes the motion.

The Court referred Counts VII and VIII of the Complaint for trial by Special Master by Order of April 27, 1993. These counts relate to the parties' dispute over the proper pricing of certain additional work performed by Comstock for Becon on the Toyota plant construction project. Both parties agree Sections 5.3 and 4.C of the Subcontract govern pricing, but each interpret these pricing provisions differently.

Special Master conducted the trial of Counts VII and VIII and has issued his Findings of Fact and Conclusions of Law. Pursuant to the order of reference, Special Master's factual determinations are conclusive and unreviewable by the Court. *See also* Fed.R.Civ.P. 53(e)(4).

## II.

Special Master concludes that the Subcontract is ambiguous on its face, and therefore, he resorts to extrinsic evidence presented at trial to interpret the agreement. Special Master finds that the parties' prior negotiations and contemporaneous conduct and declarations reveal their mutual understanding that the Subcontract requires pricing the additional work subject to Counts VII and VIII according to unit rates found in the MCAA Manual. Also, Special Master finds, based on the same evidence and the testimony of a representative of the MCAA, that page 17–2 of the MCAA Manual provides the applicable unit rate for pricing the additional work. In sum, Special Master agrees with Comstock's construction of the Subcontract. In addition to finding Becon should pay Comstock according to MCAA Manual unit rate, Special Master also finds Becon should be assessed pre-judgment interest.

## III.

### A.

Becon has filed lengthy and exhaustive objections to Special Master's report. In reply, Comstock argues that Becon's objections go primarily to factual determinations, which are not reviewable by the Court. Comstock's argument is critical to the present motion because only objections to Special Master's legal rulings are reviewable by the Court. Special Master's factual findings will not be disturbed.

 The central issue at trial was the proper interpretation of the pricing provisions of the Subcontract. Generally, construction of written contracts is a question of law reserved for the court to be answered solely by reference to the four corners of the written documents. However, the Court, in overruling Becon's motion for summary judgment on Counts VII and VIII, found that the pricing provisions of the Subcontract were ambiguous and therefore extrinsic evidence would be necessary for their interpretation. Special Master's trial of Counts VII and VII, in essence, was the taking of such extrinsic evidence, and, in turn, Special Master's report represents his construction of the Subcontract in light of that evidence. When the effect of a written contract depends largely on extrinsic evidence, the construction of the contract is essentially a finding of fact, not law. *See Cook United, Inc. v. Waits,* Ky. 512 S.W.2d 493 (1974); *Neel v. Wagner–Shuck Realty Co.,* Ky.App., 576 S.W.2d 246 (1978). In the present case, since the Special Master's construction of the Subcontract's pricing provisions is predominately influenced by extrinsic evidence, his conclusions are findings of fact that may not be reviewed by the Court.

### B.

Becon's objections to issues of law, which may be reviewed de novo by this Court, are three in number: 1) whether extrinsic evidence is admissible to interpret the Subcontract pricing provisions for additional work, 2) whether Special Master properly relied on certain rules of construction, and 3) whether Special Master's award of prejudgment interest is within the scope of reference.

Prior to referring Counts VII and VIII to Special Master, the Court ruled that extrinsic evidence would be necessary to interpret the pricing provisions of the Subcontract. Thus, the Special Master correctly admitted

extrinsic evidence to aid in the construction of the Subcontract.

In alternative to his reliance on extrinsic evidence, Special Master made reference to certain principles of contract construction set out in the Restatement (2d) of Contracts to bolster his conclusions. A careful reading of Special Master's report indicates that these principles are not essential to the report's conclusions. Thus, this Court will not review Special Master's use of these principles of contract construction since such a review would have no bearing on the overall legitimacy of the report.

Becon argues that the issue of pre-judgment interest is beyond the scope of reference because Comstock did not specifically pray for pre-judgment interest in Counts VII and VIII. This objection is primarily technical in nature. Comstock's Complaint makes a general prayer for pre-judgment interest which implicitly relates back to all counts seeking monetary damages. Thus, it would appear that the issue of pre-judgment interest is within the scope of Counts VII and VIII. Logically, the issue of pre-judgment interest should be determined in relation to each count. The parties have exhaustively briefed the pre-judgment interest issue in their memoranda to Special Master, and the Court finds Special Master's analysis of the pre-judgment interest to be a correct reading of the law. Thus, no purpose would be served in re-litigating the pre-judgment interest issue.

Accordingly, the Court **ORDERS**,

1) that Comstock's Motion to Confirm, (D.E. # 240), is **SUSTAINED,**

2) that Special Master's report, (D.E. # 234), is **CONFIRMED** and adopted by and for the opinion of the Court.

## SPECIAL MASTER'S FINDINGS OF FACT AND CONCLUSIONS OF LAW

THOMAS J. STIPANOWICH, Special Master.

On February 16, 1989, Plaintiff L.K. Comstock & Company, Inc. ("Comstock") commenced this action against Defendant Becon Construction Company ("Becon"). Comstock filed a seventeen-count complaint against Becon for certain claims for additional compensation arising from labor, material, and services provided by Comstock to Becon in connection with the Toyota Automotive Manufacturing Facility in Georgetown, Kentucky (the "Project"). The District Court severed Count 17 of Comstock's Complaint concerning Comstock's claims that the changes in the work to be performed by Comstock were so extensive as to constitute an abandonment of the contract or a "cardinal change." The hearing on Count 17 was referred to Thomas J. Stipanowich, Professor of Law at the University of Kentucky College of Law, as Special Master pursuant to Rule 53 of the Federal Rules of Civil Procedure. After lengthy hearings, the Special Master concluded that Comstock did not sustain the burden of proving an abandonment of the contract or a cardinal change. The Special Master's findings of fact and conclusions of law were adopted in full by the District Court.

Comstock moved for a trial of Counts 7 and 8 before a special master. On April 2, 1993, the Court sustained Comstock's motion. Subsequently, the parties waived jury trial and stipulated to trial before Special Master Stipanowich pursuant to Fed.R.Civ.P. 53(e)(4). The Special Master presided at the trial of Counts 7 and 8, which began June 21, 1993 and finished June 24, 1993. Counsel submitted post-trial memoranda, and Counts 7 & 8 are ready for determination.

The issue raised by Counts 7 and 8 is one of contract interpretation—specifically, whether or not Comstock is entitled to be reimbursed for additional supplemental steel work at a rate determined by an industry manual referenced in the parties' contract. For the reasons stated below, the Special Master concludes that Comstock's interpretation is consistent with the express language of the agreement and surrounding circumstances including course of performance and usage of trade, and that Comstock is entitled to the relief requested under Counts 7 and 8 of the Complaint.

## I. BACKGROUND AND ISSUES

### A. The Characters and the Setting

This dispute arose out of the construction of an automotive assembly plant in Georgetown, Kentucky for Toyota Motor Manufacturing, U.S.A., Inc. ("Toyota"). Toyota contracted with Ohbayashi Corporation ("Ohbayashi") for construction management services on the Project. Beneath Ohbayashi were nine general contractors, and beneath them over 200 subcontractors and more than 400 sub-subcontractors. Giffels Associates, Inc. ("Giffels") was the engineer for the Project.

Becon was the general contractor for the plant's utility area, which was designed to supply steam, electricity, and other essentials for plant operation. Becon subcontracted with Comstock to perform the electrical and mechanical work for the utility area. Most of Comstock's work involved the utility building (Area 500), but Comstock also performed work on the trestle (Area 501), the waste water treatment building (Area 502), the water pump house building (Area 503), the electrical switch gear building (Area 504), the diesel fuel pump house building (Area 505), and the liquid tank farm area.

### B. The Controversy

Section 5.3 of the subcontract between Becon and Comstock contained a provision establishing a mechanism for pricing of changes to the work. P.E.1955.[1] Under this provision, unit rates for installation of mechanical work—that is, the number of hours required to do a particular unit of work— were to be determined in accordance with the estimating guide published by the Mechanical Contractors Association of America, Inc. (that is, the MCAA Labor Estimating Manual, or "MCAA Manual").

During construction, a dispute arose regarding the application of the MCAA Manual to determine the amount of labor required to install additional steel for support of piping systems. Comstock argued that for the purpose of pricing changes labor units should be determined in accordance with the following provision on page 17–2 of the MCAA Manual (P.E. 1491):

> **Light Iron** Unload fabricate, distribute, erect, and fasten either by bolting or welding to building construction and based on a minimum weight of 10 lbs. for any configuration.

> –.825 man hours/lb–

Becon disagreed and some time later advanced the proposition that it could pay a "fair price" for additional supplemental steel work performed by Comstock.

### C. The Issues

To determine whether Comstock is entitled to relief under Counts 7 and 8, two questions must be answered:

(1) Whether the provision addressing installation of "light iron" on page 17–2 of the MCAA Manual is applicable to additional steel work of the type involved in Change Orders COR 122 and COR 177 which are the basis of Comstock's Counts 7 and 8?

(2) Whether Becon retain the right to unilaterally determine or to negotiate a "fair price" for this work?

## II. FINDINGS OF FACT

### A. Contract Bidding and Negotiations; Establishment of Unit Price Structure

*Arm's Length Negotiations.* Becon and Comstock are large, sophisticated contractors. Becon is wholly owned by the Bechtel Company. Comstock's annual revenue since 1984 ranged between $300,000,000 and $500,000,000. R4 at 52. The evidence indicates that the parties dealt at arm's length.

*Original Bid Form.* In accordance with Becon's original solicitation, Comstock's original bid included a schedule of unit prices. The bid form stated that Comstock would perform additional work "which incurs costs not contemplated by the UNIT PRICES, in accordance with the GENERAL and SUP-

---

**1.** Citations to the record are by volume and page. Plaintiff's exhibits are designated "P.E.," and Defendant's exhibits are designated "D.E."

"R1" refers to Volume 1 of the Count 17 trial transcript, and "2R1" refers to Volume 1 of the Count 7 & 8 trial transcript.

PLEMENTARY CONDITIONS." P.E. 3006, p. 1, para 1.02(a); 2R1 at 58. The unit prices were contained on a form supplied by Giffels, the project engineer, and transmitted to Comstock by Becon as a part of the bid package. 2R3 at 61–62.

*Exceptions by Becon to Unit Prices.* Comstock and Becon conducted a series of meetings to evaluate the Comstock bid and negotiate a subcontract. P.E. 28, 32, 41, 43, 45. In a meeting held February 23, 1987, Becon informed Comstock that the unit prices contained in Comstock's bid were too high. P.E. 41; 2R1 at 60, 62. The parties engaged in lengthy negotiations regarding unit prices for change orders. P.E. 1224; 2R3 at 81.

At this time, the parties considered the use of industry manuals, including the Labor Estimating Manual published by the Mechanical Contractors Association of America, Inc. (MCAA), for pricing of additional work (hereafter "MCAA Manual"). P.E. 1491. Becon was furnished with copies of the MCAA Manual for review purposes. P.E. 1228, 2R3 at 82–84.

*Adoption of MCAA Manual as Basis for Unit Pricing of Additional Work.* At the request of Becon, Larry Hafling of Comstock prepared a sample comparison between change orders priced in accordance with the MCAA Manual and those priced by Comstock's original unit prices. P.E. 1950; 2R1 at 62–66. This information was prepared based upon the unit price format developed by Giffels and furnished to Comstock by Becon with the original bid package. 2R3 at 69–71.

By letter of March 20, 1987, Becon accepted Comstock's proposal to base mechanical installation unit rates on the MCAA Labor Estimating Manual. P.E. 1956; 2R1 at 68–70; 2R3 at 72–74. The parties also agreed on wage rates to be employed in connection with the manual, since the manual set forth only man hour units, rather than actual labor prices, for the items covered. 2R1 at 63, 66–67; P.E. 1950, 1223; R3 at 98–100. Comstock signed the letter of intent subject to scope clarifications made prior to the bid, in the bid, and in subsequent negotiations. *Id.* On March 23, 1987, Becon Project Manager Chuck Kinney notified Becon corporate management that the MCAA manual and a manual on electrical work published by NECA "will be used to determine the labor portion of changes to this Subcontract." P.E. 1228; 2R3 at 82–87.

Section 5.3 of the Subcontract subsequently signed by the Becon and Comstock (P.E. 1955) addressed the issue of unit prices for pricing additions or deletions to the work:

The following unit prices are for use in pricing additions or deletions in the work:

I. Wage Rate:

Value of Change

| | $0 to $5000 | $5001. to $75,000. | Above $75,001. |
| --- | --- | --- | --- |
| Mechanical | $35.91/hr. | $34.15/hr. | $32.29/hr. |
| Elec. Journeymen | $36.15/hr. | $35.66/hr. | $35.18/hr. |
| Elec. Sub–Journeymen | $35.32/hr. | $34.05/hr. | $31.99/hr. |

The wage rates include support labor, material handling, tools, consumables, testing and all construction equipment up to and including 18 ton hydraulic cranes.

II. Installation Unit Rates—Mechanical

The standard used will be the estimating guide published by the Mechanical Contractors Association, without any adjustments for height, wind chill factors, etc.

III. Installation Unit Rates—Electrical

The standard used will be the estimating guide published by the National Electrical Contractors Association, without any adjustments.

IV. Markup (Overhead and Profit)

21% on Labor and Material
10% on Subcontractors

V. Permanent Material

Actual cost based on priced Purchase Order.

---

The foregoing provision, drafted by Becon after lengthy negotiations, establishes a method for pricing changes. 2R1 at 72–75; 2R3 at 76–77, 81. Part I sets forth a graduated scale or "sliding scale" of wage rates which vary based upon the dollar value of the change. Part II provides that unit rates for installation of mechanical work—that is, the number of hours required to do a particular unit of work—will be determined in accordance with the MCAA Labor Estimating Manual. By multiplying a particular "installation unit rate" by the number of units installed, the total number of hours allocated to perform certain work could be derived for change order purposes. By multiplying this total hour figure by the appropriate wage rate set forth in Part I, a dollar value for the particular installation could be assigned. P.E. 1224 at 3; 2R3 at 76–77, 81.

As Section 5.3 provides, the parties agreed to use installation unit rates established in the MCAA Labor Estimating Manual "without any adjustments for height, wind chill factors, etc." 2R3 at 78–79. Such factors, set out in the first pages of the MCAA Manual under the heading of "Labor Correction Factors," were designed to reflect various field and work conditions which actually affect labor productivity and installation cost of mechanical work performed. P.E. 1491 at 3.1ff. Most of the labor correction factors contemplate an upward adjustment of rates (reflecting a decrease in labor productivity). 2R4 at 117. At Becon's insistence, Comstock waived application of these factors. 2R1 at 78. Becon's intent was to provide straightforward pricing system without room for negotiation—an important goal on a project where numerous changes were contemplated.

R8 at 157. At the same time, of course, each party assumed the risk that in a given case resultant pricing might or might not reflect the actual or reasonable cost or value of procurement and installation.

According to John Mayne, Jr. of Comstock, whose role required him to be involved in the change order process, where there was an applicable labor installation rate in the MCAA Manual, Comstock and Becon were required to price mechanical change order work based upon that rate pursuant to the terms of Section 5.3 of the Subcontract. 2R1 at 74–75; 2R2 at 107–10. Only in circumstances where no unit price had been established was Becon authorized to seek a separate "fair" price for extra work. 2R2 at 108.

Contemporaneous written communications by the Becon organization strongly support Mr. Mayne's interpretation. In an internal memorandum of March 23, 1987, Becon Project Manager Chuck Kinney notified Becon corporate management that the MCAA and NECA manuals "will be used to determine the labor portion of changes to this Subcontract." P.E. 1228, 2R3 at 82–87.

Later correspondence by McKinney's successor, Paul Sheridan, is also consistent with Mr. Mayne's position. In his letter of November 17, 1987 to Becon's Paul Sheridan regarding negotiations over CCN 70, Ron Gordon noted, "On November 16, you stated that we had to utilize the MCA rates and that they are *not* negotiable. . . ." P.E. 1063.10. In response, Becon responded that *"Ohbayashi and Becon have accepted the appropriate MCA rate for past change orders and will continue to do for the remain-*

der of this contract." P.E. 1306; D.E. 18 (emphasis added).

On January 20, 1988, during discussions regarding the use of the .825 "light iron" rate in the MCAA for pricing of supplemental steel, Sheridan stated:

Becon has reviewed the MCA book and cannot find a rate that is truely [sic] applicable for this situation. *In this case*, Becon and Comstock must negotiate an acceptable unit rate that is applicable for the work actually performed.

D.E. 36 (emphasis added). In his letter of January 26, 1988 letter, Mr. Sheridan made the primacy of the unit rate structure even clearer:

These *[MCAA]* rates are to be used when they are applicable. When they are not applicable, then Comstock, Becon and Ohbayashi need to agree to alternative means of pricing additional work.

P.E. 1358 (emphasis added). Despite considerable discussion and negotiation between the parties in late 1987 and early 1988, no mention was apparently ever made of Becon's right to ignore the MCAA manual and seek a "fair price" under 4(c). 2R3 at 140–41.

The following exchange from Mr. Sheridan's deposition strongly reinforces the same interpretation:

Q: What did you mean when you said that? [in Deposition Ex. 100, P.E. 1306]

A: The letter stands on its own; we will accept the appropriate MCA rate, which we had done in the past. When they turned in piping changes, we added 100 feet of piping. We went to the MCA manual, we used the appropriate rate for the appropriate pipe sizes, appropriate valves, and we paid them that rate. *So we will use the appropriate rates.* We issued a number of change orders based on that issue. That's what it says, the appropriate MCA rates.

Q: Were you telling Mr. Gordon or Comstock that you were not going to deviate by starting to negotiate unit rates generally other than what was set forth in the manual? ...

A: We were saying in that letter that Comstock should use the appropriate unit rates on it. *If there was not an appropriate unit rate, it was not a unit rate in that manual, then we would negotiate under the other terms* of compensation on it. That type of action is consistent throughout Becon's and my previous experience with Bechtel and Becon and Lummus and Raymond International. *It's virtually impossible to put every unit rate, every appropriate unit rate in the contract.* It's not unusual during the course of the contract that changes are done on a unit rate basis to come up with some number that you negotiate during the course of the contract....

Q: What was inaccurate about the reasoning—the comments in the letter [Deposition Ex. 100, P.E. 1306] with respect to the reasoning Comstock originally used to price the change order?

A: *The agreement we had with Comstock all along was to use the appropriate MCA rates. If there was no appropriate MCA rates, then the contract calls for negotiation on a rate. So we should have in this case, since it was iron worker structural steel, not pipe fitter supplemental steel, we should have negotiated rates.* We were willing to negotiate a rate and we made an offer to them.

Sheridan Depo. at 177–79 (emphasis added.) [2]

### B. Comstock's Installation of "Supplemental Steel"

***Requirements of Summary of Work.*** The Summary of Work incorporated in the Sub-

---

2. *See also* Sheridan Depo. at 135 ("Q: Did the contract call for the use of the MCAA manual? ... A: Contract called for the appropriate use of MCA and NECA manuals."); at 156 ("Q: But looking at the page that follows 6474, on page C006475 [in Deposition Exhibit 58, Plaintiff's Exhibit 1500] you had instructed Comstock to price that work in accordance with unit rates; is

contract contains references to certain steel work. 2R1 at 81, P.E. 1955. Section 49 provides:

STRUCTURAL STEEL

In addition to the miscellaneous structural steel in this contract, the Subcontractor shall provide all engineering, detailing, material, equipment and labor necessary to fabricate, paint and install all the catwalks, ladders, platforms and stairways around the Boilers, Economizers, Fans and Breaching. Supplementary steel is included where required, but not to exceed the following:

A) Trestle 0 lb.

B) Indoor.steel 54,404 lb.

*Supplemental Steel.* As Section 49 indicates, Comstock was required to install "supplementary steel," also described as "supplemental steel," and to price that installation as part of its mechanical work. 2R1 at 82.

Contract General Conditions Section 3.3 (P.E. 1955) provides, "Words and abbreviations which have well-known technical or trade meanings are used in the Contract Documents in accordance with recognized meanings." Supplemental steel is ·distinguished from structural steel by the parties and by common usages in the construction industry. It is also consistently identified with the support of piping.

Comstock's John Mayne, Jr., when questioned regarding usage in the mechanical industry, described structural steel or "building steel" as being "the beams and columns that hold up the walls and roof, intermediate floors, stairs, [etc.]." 2R1 at 44. Structural steel may consist of wide flanges, H columns, angle iron, channels, and other shapes which fill the foregoing purpose. 2R2 at 154. Sup-

plemental steel, on the other hand, was "some type of structural type shape or member that would have to be installed because of the lack of building steel.... If there is no building steel where your [pipe] hanger needs to be, you have to add some supplemental steel." 2R1 at 44. This was also the usage on the present job. 2R1 at 82. Supplemental steel, like structural steel, may consist of wide flanges, angle iron, channels, and other shapes; the distinction is a functional one. 2R2 at 154–57; 2R4 at 131–32.

Testifying for Becon, Paul Sheridan offered a similar description. He defined supplemental steel as something other than structural steel. As he interpreted the term, supplemental steel was that used for the support of piping. He confirmed that generally iron workers erect structural steel and pipefitters install supplemental steel. Sheridan depo. at 125, 172; 2R3 at 22. Becon's Dale Eichhorst [3] also acknowledged that "[s]upplemental steel is the type of steel that we use ... in addition to the structure ... [;] something to hang the hanger from to go between the purlins or whatever are required that wasn't existing in the building structure itself." 2R4 at 89.

These definitions are generally consistent with those promulgated by the American Institute of Steel Construction (AISC). Becon's Dale Eichhorst acknowledged that the AISC's Manual of Steel Construction (AISC Manual) was used by "designers as well as constructors." 2R4 at 33, 86–87. Ohbayashi's project manager, Robert Jordan, testifying on behalf of Becon, was also familiar with the AISC Manual, which was introduced in part by Becon. 2R4 at 149–50; D.E. 54. The portion referenced by Becon contains no

---

that correct? A: I will say that *in all cases* we told them to use the appropriate unit rates.") (emphasis added); *and* Gordon Depo. at 96 ("Q: You knew, did you not, that Mr. Sheridan thought a request based on a rate of .825 man hours per pound was outrageous? ... A: Was inappropriate is what he said. Q: Was inappropriate? A: That's what he said. Q: He told you .825 was inappropriate? A: *That we were interpreting the MCA incorrectly.*") (emphasis added). *See also* 2R1 at 74 (applicable MCAA prices were uniformly used in pricing changes); 2R3 at 146 ("Q: [to Mr. Eichhorst] ... where there was an applicable rate in the MCAA book, the fact is that

neither Comstock nor Becon then went and priced it on any other basis. Isn't that right? A: I believe you are right."); R8 at 157–58 ("Q: [to Mr. Eichhorst] ... this [Comstock coming up with its own unit rate] was done in those fairly rare instances where the MCAA manual didn't have the exact item specified that Comstock was required to do? A: That's correct.").

3. Eichhorst served first as subcontract administrator, then project engineer, and, toward the end of the project, Becon's site manager for the Project.

definition of structural steel. It does, however, reference another publication, the AISC's Code of Standard Practice for Steel Buildings and Bridges [4] ("AISC Code") which defines structural steel:

> 2.1 "Structural steel," as used to define the scope of work in the contract documents, consists of the steel elements of the structural steel frame essential to support the design loads. Unless otherwise specified in the contract documents, these elements consist of material as shown on the structural steel plans and described as:
>
> . . . . .
>
> Beams, Girders, Purlins and Girts ... Columns, Posts, Connecting material for framing structural steel to structural steel ... Floor Plates (checkered or plain) attached to steel frame ... Hangers essential to the structural steel frame ...
>
> 2.2 The classification "Structural Steel," does not include steel, iron, or other metal items not generally described in Paragraph 2.1, even when such items are shown on the structural steel plans or are attached to the structural frame. These items include but are not limited to:
>
> . . . . .
>
> *Items required for the assembly or erection of materials supplied by trades other than structural steel fabricators or erectors.*

AISC Code (effective September 1, 1986) (emphasis added). (P.E. 3010, submitted subsequent to conclusion of oral hearings). The AISC Manual, referenced by Becon, simply gives examples of structural steel. When the AISC seeks to define "structural steel" for the purpose of distinguishing the scope of work involved (the purpose for which it is referenced in the MCAA Manual), it adopts the same functional definition that the par-

ties recognized during construction. The AISC's definition of "structural steel" obviously excludes supplemental steel installed by pipefitters to support piping since it is an "[i]tem required for the ... erection of materials supplied by trades other than structural steel fabricators or erectors." [5]

*Allowance for Supplemental Steel.* Due to the incomplete nature of the structural drawings furnished to Comstock, it was not possible for Comstock's steel fabricator, NPS, to determine how much supplemental steel would ultimately be required on the Project. Therefore, it was agreed that the contract would contain an allowance of 54,404 lbs. for supplemental steel. 2R1 at 82–83; 2R3 at 118; 2R4 at 126.

*Exceeding of Supplemental Steel Allowance.* In early September, 1987, NPS notified Comstock that it had fabricated more than the allowed 54,404 lbs. of supplemental steel, and requested from Comstock a change order for steel poundage in excess of the allowance. 2R1 at 85–86; P.E. 1254. On September 21, 1987, Comstock wrote to Becon regarding the overrun of the supplemental steel allowance and requested a change order for reimbursement for "the additional labor and material involved with the extra supplemental steel required for our pipe supports/hangers." 2R1 at 86–87; P.E. 1261.

At Becon's request, conveyed through Comstock, NPS furnished documentation regarding excess supplemental steel. 2R1 at 110; P.E. 1296. Becon never specifically challenged the actual poundage of supplemental steel furnished by NPS during the course of the job. 2R1 at 110; 2R3 at 118.

### C. Application of MCAA Manual to Supplemental Steel

*Pricing of CCN 70.* The issues presently in dispute over the pricing for supplemental

---

4. The preface to the AISC's Code of Standard Practice provides as follows:

 When contractual documents do not contain specific provisions to the contrary, existing trade practices are considered to be incorporated into the relationships between the parties to a contract. As in any industry, trade practices have developed among those involved in the purchase, design, fabrication and erection of structural steel. The American Institute of Steel Construction has continuously surveyed the structural steel fabrication industry to de-

termine standard practices and, commencing in 1924, published its *Code of Standard Practice.* Since that date, the Code has been periodically updated to reflect new and changing technology and practices of the industry.

5. Also see 2R2 at 31, where Mr. Mayne testifies that "as a matter of industry practice ... steel, whether ... light, ... heavy, ... structural, ... supplemental ... can be of various types of structural shapes."

steel first came to light in connection with CCN 70. When Becon first issued that change notice, Comstock declined to quote the work. R9 at 64. Becon appealed to Mr. Cleve Whitener, a member of Comstock's upper management, and Comstock agreed to provide a quotation. R9 at 65–66. Comstock's John Mayne, Jr. asked Ron Gordon (who was sent to the Project to assist in pricing change orders in October, 1987) to review the proposed steel pricing in connection with CCN 70. 2R1 at 96, 99; R5 at 122.

Mr. Gordon concluded that Comstock's initial price for supplemental steel installation was too low, and he reviewed the MCAA Manual's steel pricing. 2R1 at 99. He thus became aware of the contents of p. 17–2 of the MCAA Manual. See 2R1 at 99.

*Application of MCAA Manual p. 17–2, "Light Iron & Structural Shapes."* Page 17–2 of the MCAA Manual, entitled "Light Iron & Structural Shapes" (P.E. 1491), states:

### MISC. LABOR OPERATIONS

### LIGHT IRON & STRUCTURAL SHAPES

The fabrication and erection of light iron and structural steel is a costly item. It can become a serious labor loss and must be approached by the estimator with extreme caution. Labor will vary just by the quantity or configurations involved (from a single bracket or support to many items and shapes of miscellaneous iron). Light iron is that material which is not considered structural steel such as angles or channels, etc. Structural steel is wide flange beams, H-columns, etc.

The following items should be considered:

#### Light Iron

Unload fabricate, distribute, erect, and fasten either by bolting or welding to building construction and based on a minimum weight of 10 lbs for any configuration.

–.825 man hours/lb–

#### Structural Shapes

Unload fabricate, distribute, erect, and fasten either by bolting or welding to building construction and based on a minimum weight of 500 lbs for any single piece.

–.03 man hours/lb–

This section identifies three categories of steel: light iron, structural steel, and structural shapes. Labor installation units are established steel falling within the first and last of these categories. According to page 17–2, the unit of .825 man hours per pound for "light iron" was established for steel members which

(1) were not considered structural steel;

(2) were unloaded, fabricated, erected and fastened either by bolting or welding to building construction;

(3) were part of a configuration of members weighing at least 10 pounds.

The unit of .03 man hours per pound for "structural shapes" was established for steel members which

(1) were unloaded, fabricated, erected and fastened either by bolting or welding to building construction; and

(2) weighed at least 500 pounds individually.

Comstock initially quoted CCN 70 at the .825 man hour unit for light iron in the MCAA Manual. 2R1 at 90. Since CCN 70 consisted of items that both parties considered to be *structural* steel, however, the .825 "light iron" unit was not appropriate. Comstock acceded to Becon's objections and proposed another basis for pricing. P.E. 1305; 2R3 at 35; R9 at 65–66. Becon ultimately decided to withdraw the CCN and award the structural work to another subcontractor. P.E. 1305. At this time, however, Becon's Paul Sheridan assured Comstock that "Ohbayashi and Becon ha[d] accepted the appropriate MCA rate for past change orders and will continue to do so for the remainder of this contract." P.E. 1306.

The Table of Contents for the Section of the MCAA Manual entitled "Miscellaneous Labor Operations" does not distinguish the category of Light Iron & Structural Shapes

from other categories of labor installation units in the manual. P.E. 1491. Moreover, although the format is not tabular like many other pages of the manual and is somewhat less specific in categorization than certain other portions of the manual, the page is similar in one essential: it does identify a specific number of man hours per unit for certain mechanical work. 2R3 at 20.

In his deposition, despite coaching by counsel for Becon, Mr. Sheridan made several references to the .825 figure expressed on page 17–2 of the MCAA Manual as a "rate." Sheridan Depo. at 136, 137, 138, 141, 144 (counsel's objections to "rate" characterization); 142, 143, 158, 172, 202.

His usage echoes some very straightforward statements by Becon during the Project regarding the nature of the .825 "light iron" figure as a rate. P.E. 1344 ("There is some doubt if this is the proper labor *rate* for the Supplemental Steel installed by Comstock or is another *rate* more appropriate." (Emphasis added.)); P.E. 1353 (referring to "0.825 Manhour/lb. Labor Rate"); P.E. 1358 ("the MCA Rates are not applicable to the Supplemental Steel").

In sworn testimony, Barney Winger, the mechanical contractor who served as Chairman of the MCAA Labor Estimating Manual Committee, described the .825 figure as "a man hour unit which has been calculated to be applied under the circumstances, which it [sic] is defined here as light iron." Winger Depo. at 40. Mr. Winger proceeded to explain how this unit could be applied to calculate the number of hours allocated to installation of a light iron configuration weighing up to 499 pounds. Winger Depo. at 44–45. He indicated that such an application of the MCAA Manual was appropriate as part of a "total estimated system." Winger Depo. at 45. He also indicated that the labor units set forth in the manual could be described as "rates." Winger Depo. at 81–82.

No portion of 17–2 was specifically excluded for use in unit pricing, unlike the labor correction factors in the Manual. 2R3 at 115. Neither party, however, specifically discussed the applicability of the MCAA to supplemental steel during the negotiations and bid evaluation meetings. 2R3 at 27–28.

*Applying the MCAA Manual to Pricing of Change Orders for Supplemental Steel.* On November 27, 1987, Comstock submitted its first quotation for supplemental steel in areas 502 and 503; on December 9, 1987, it submitted a revised quotation that included areas 502, 503, and 504. P.E. 1310, 1319. Each quote used the .825 man hour unit for "light iron" on p. 17–2 of the MCAA Manual.[6] P.E. 1491. Comstock installed a total of 38,816 pounds of supplemental steel not covered by the allowance in the Subcontract. Multiplying this poundage by .825, Comstock derived a total of 32,023.2 man hours. Using the wage pricing formula agreed upon by the parties, (2R1 at 112–14), Comstock derived a total labor cost of $1,148,581.32. With material, overhead and profit factored in, the total change request for supplemental steel in areas 502, 503 and 504 was $1,428,766.33. 2R1 at 115; P.E. 1319.

Becon took no action on Comstock's initial request until December 21, 1987. 2R1 at 117–20. On that day, Comstock ultimately submitted three different payment applications. The first, rejected by Becon, requested payment for 90 percent of the previously submitted supplemental steel quotation. P.E. 1321. The next request contained no prices for additional supplemental steel. P.E. 1322. The third request, developed in response to Becon's request and ultimately approved by Becon, sought immediate payment of 10 percent of the supplemental steel proposal pending final resolution of the steel issue. P.E. 1323. According to Becon's Paul Sheridan, the 10 percent payment figure developed by Becon was not generated through any detailed analysis, but was a "nice, round number"—a "perfunctory" number. Sheridan Depo. at 111–12.

---

6. One prior change order request, CCN 43, involving a minor amount of supplemental steel was priced by Comstock without resort to the MCAA Manual. 2R1 at 96–99; 2R3 at 44–45; P.E. 3007. This was prior to Mr. Gordon's arrival and apparently without knowledge of or reference to the contents of p. 17–2 of the MCAA Manual. It was Comstock's practice, however, to review the MCAA Manual for applicable unit rates when and as it became necessary to price specific items of additional work. 2R1 at 101–02.

On January 13, 1988, Comstock submitted another request for supplemental steel, this time for areas 500 and 501 (COR 177). P.E. 935.1. In these areas Comstock installed a total of 41,749 pounds of supplemental steel in excess of the 54,404 pound allowance set forth in the Subcontract. Comstock again used the unit multiplier of .825 man hours per pound, which resulted in a total of 34,443 man hours. Using the wage pricing formula agreed by the parties, Comstock derived a total labor cost of $1,232,804.58. With material, overhead and profit factored in, the total change request for supplemental steel in areas 500 and 501 was $1,515,954.98. P.E. 935.1.

On January 15, Becon responded to Comstock's COR 177 in writing. Becon now noted that Comstock was requesting almost $3,000,000 for supplemental steel. According to Becon, "[t]he main issue that Becon and Ohbayashi are attempting to resolve is if Comstock has properly applied the .825 man hour/pound labor rate from the MCA Manual." Becon authorized Comstock to invoice for 10 percent of the amount claimed in COR 177, just as it had with respect to the proposal for supplemental steel for areas 502, 503, and 504 (COR 122). P.E. 1344. However, Becon noted that its "acceptance of a 10% billing against Comstock's proposal for these two CORs ... [did] not mean that Ohbayashi and Becon ... ha[d] accepted or rejected the dollar value of either proposal." P.E. 1344.

In addition to denying for the moment full payment of the full steel proposals, Becon withheld 5 percent retainage on the 10 percent paid on each proposal.

### D. Initial Communications with MCAA.

To resolve the dispute regarding applicability of the .825 man hour/pound labor rate from the MCAA Manual, both Comstock and Becon made telephone inquiries to the MCAA, the organization which published the Manual. See, e.g., P.E. 1337, 1340, 1348; 2R1 at 121–23; 2R4 at 3–4; R12 at 100–01. The parties then disagreed as to whether their oral inquiries resulted in the MCAA confirming or rejecting the applicability of the rate. P.E. 1348, 1358, 1359.

Both Mr. Eichhorst and Mr. Sheridan acknowledged that the MCAA would reasonably be expected to know how to interpret its own manual. 2R4 at 3, R12 at 100–01.[7]

### E. Arguments Raised by Becon.

On January 20, 1988, in a letter drafted by Paul Sheridan, Becon set forth several reasons why it considered the .825 "light iron" rate inappropriate for application to supplemental steel. P.E. 3000.

*Alleged Unfair Allocation Under Allowance.* Mr. Sheridan first suggested that Comstock had acted unfairly in determining what steel was within the 54,404–pound allowance and what was additional. His argument appeared to be that Comstock allocated heavier weights of steel (which might be subject to a lower installation multiplier under the MCAA Manual) to the allowance, and tended to treat lighter weights of steel—subject to the "light iron" rate—as additional. However, there is no convincing evidence supporting his concerns. Comstock logically applied the allowance to Area 501, the area with the greatest amount of supplemental steel and where the installation was likely to be the most difficult.[8] 2R1 at 131–32; 2R2 at 163; 2R4 at 101–13.

*"Savings" Due to Shop Fabrication.* Sheridan next argued that the "light iron"

---

7. Q: [to Mr. Sheridan] ... the reason you contacted the MCAA is because the MCAA has a trade association offering the rate book, would be in your mind somewhat of an authority on whether or not their rates applied to this supplemental steel on the project? A: Yes, I would consider them knowledgeable in the, how, what was put into the rate structure.... I wouldn't use the term authority.... I just said it was their publication and they would be knowledgeable on how the rates were developed. Q: ... Perhaps more knowledgeable than either Comstock or Becon? A: Perhaps."

8. "Q: [to Mr. Eichhorst] If Comstock is not entitled to apply the entire allowance to the 501 building, what would you suggest would be fair and equitable as far as the allowance is concerned? A: I don't think I said that it wasn't. 2R3 at 133–34.

installation rate was based on field assembly, and therefore any savings resulting from shop fabrication would have to be reflected in applying labor correction factors. P.E. 3000. Since much of the supplemental steel was shop fabricated, he concluded, a labor correction factor had to be applied to the .825 rate.

In performing work on the Project, Comstock did "unload, fabricate, distribute, erect, and fasten" the supplemental steel members as the light iron rate presupposes. 2R1 at 142–46. To the extent that "fabricate" is used in the sense of "field assembly," Comstock did fabricate all the configurations because the supplemental steel arrived at the job site in pieces. 2R2 at 141–43; 2R1 at 142–46.[9] Assuming arguendo that the reference to "fabrication" refers to the process of cutting and drilling and that the reference is to each single piece of steel, rather than the configuration, two items are noteworthy. First, Comstock did perform some cutting and drilling and, due to the lack of information on the drawings, there was more of this type of fabrication than would have occurred on a well-engineered job. 2R1 at 135–37. Second, even if the Manual's Basic Assumptions do call for application of a negative labor correction factor, the parties agreed to exclude it. 2R1 at 137; 2R3 at 134–35.

Significantly, Comstock's written inquiry to the MCAA regarding application of the .825 rate on the Project indicated that the supplemental steel components were "shipped *per cut finished piece* only, not assembled." P.E. 1365 (emphasis added). The MCAA responded that Comstock's interpretation applying the .825 rate was "consistent with the intent of the [MCAA] Labor Estimating Manual." P.E. 1369.

***Alleged Limitations of MCAA Manual Categorizations.*** Sheridan's final argument, while not clearly articulated, was to the effect that the supplemental steel installed by Comstock was in whole or in part not "light iron" as defined by the MCAA Manual. P.E. 3000.

In his view, apparently, the light iron and structural shapes categories for which labor rates were supplied covered only a limited range of steel shapes and sizes. Reading between the lines, one takes his meaning to be that "light iron" involved channels and angles weighing more than 10 pounds and less than 100 pounds, but not wide flange sections and other shapes in the same weight category.[10] For the latter, apparently, the MCAA provides no rate.

Comstock's John Mayne testified that the MCAA's definition of "light iron," like the term "supplemental steel," refers to angles, channels and other steel items which were not functioning as structural steel and which were used for support of piping—including wide flange shapes and other shapes not specifically mentioned in the definition. 2R2 at 28, 31, 154–158. The reference to "angles, channels, etc." indicates that the listing was illustrative and not exclusive. He indicated that because a separate rate (for "structural shapes") covered individual steel members of 500 pounds or more, the maximum weight of any single steel member in the "light iron" category would be 499 pounds. 2R1 at 146.

Pipe supports may consist of several different kinds of shapes, configured in similar ways. 2R2 at 56; 154–163, 164–65; P.E. 3010. Supplemental steel members of different shapes may serve the same purpose, in the same location, have the same weight, and require similar amounts of labor to install (such as a wide flange and two channels placed back to back). R3 at 149–50.

The same shapes and sections which are classified as "light iron" when ancillary to the primary building steel and installed for the purpose of pipe support may be considered structural steel when used for primary building steel and for certain other purposes. The distinction, as John Mayne testified, is a functional one. 2R2 at 154–57. Significantly, the work covered by CCN 70, which both

---

**9.** The "Basic Assumptions" section of the MCAA Manual may be read to equate "fabrication" with "assembly of a configuration" because of the association of these terms in the Basic Assumptions portion of the Manual, which states that labor units are "based on field *assembly* ( ... savings resulting from shop *fabrication* would

have to be reflected when applying ... labor correction factors)." P.E. 1491 at p. 2–1.

**10.** Whether or not this was the meaning intended by Mr. Sheridan, this is the position articulated by Becon at trial.

parties identified as involving "structural steel," includes a wealth of angles. See R9 at 64–65; 2R3 at 31; R7 at 92, 2R4 at 31; 2R1 at 88, 99; D.E. 15. There were also numerous structural steel subcontract amendments in which the parties priced angles and channels at a rate other than .825 man hours per pound. 2R1 at 165–70; 2R2 at 158; P.E. 3007—CCN 001 (tank farm steel); 2R1 at 175–77; P.E. 3007—CCN 159/COR 1047.

"Structural shapes," Mayne indicated, was a generic classification which could refer to either light iron or structural steel. 2R2 at 26, 31. As defined on page 17–2, however, it appears to be limited to single pieces weighing at least 500 pounds. See P.E. 1491; 2R2 at 57.

***The Real Issue Was the Rate.*** In his deposition, Becon's Paul Sheridan admitted that the essential issue was the proper labor installation rate. See Sheridan Depo. at 142–143, 196–197, 202. This is consistent with statements in Sheridan's letter of January 15, 1988. P.E. 1344.

While negotiating several other change orders containing supplemental steel elements in January, 1988, Mr. Sheridan proposed wholesale application of a supplemental steel labor rate based on an average of three other industry guides—a substantially lower rate than the "light iron" unit in the MCAA Manual. P.E. 1353; Sheridan Depo. at 107–09, 126, 130–38. Sheridan admitted that he tried to develop a rate which would be slightly higher than what it would cost to do the work. Sheridan Depo. at 138. He considered the MCAA rate of .825 man hours per pound for light iron to be a "ludicrous rate." Sheridan Depo. at 147.

Becon's Dale Eichhorst also admitted at one point that the "basic disagreement" involved the proper rate—the number of man hours per pound—to be applied to the additional supplemental steel. 2R3 at 123–24. He admitted that Becon probably would have paid for the supplemental steel as "light iron" if the rate had been .046 man hours per pound instead of .825. 2R3 at 132.

### F. Interpretation by the MCAA Labor Estimating Manual Committee

***Written Inquiry by Comstock.*** On February 2, 1988, Comstock (through Brock & Blevins) submitted a written inquiry to the MCAA to confirm the applicability of the .825 "light iron" rate to supplemental steel supporting piping systems. P.E. 1365; 2R1 at 159–63. Comstock's submission contained a cover memo which generally described various aspects of the installation at the Project, a photocopy of page 17–2 of the MCAA Manual, and examples of construction drawings detailing supplemental steel configurations for the Project.

***Response by the MCAA Labor Estimating Manual Committee.*** The letter was submitted for discussion at a regular meeting of the MCAA's Labor Estimating Manual Committee. After discussing the question, the MCAA Committee issued a letter stating that Comstock's interpretation "is consistent with the intent of the Labor Estimating Manual." P.E. 1369; 2R1 at 163.

Barney Winger, the experienced mechanical contractor who has served as Chairman of the MCAA's Labor Estimating Manual Committee, testified that the MCAA Committee deliberated in response to Comstock's letter. Winger Depo. at 34, 55, 61. The Committee rendered its own collective interpretation of the import of the provisions of page 17–2. Winger Depo. at 50, 61, 66. A letter endorsing Comstock's interpretation was drafted by the Committee and its communication to Brock and Blevins was authorized. Winger Depo. at 91, 94.

Under intensive questioning by counsel for Becon, Winger explained that the .825 figure on page 17–2 of the Manual "is the man hour unit which has been calculated to be applied under the circumstances, which it [sic] is defined here under light iron." Winger Depo. at 40. He refused to characterize the contents of page 17–2 as "fundamentally different" in form from page 4–1, nor would he agree that page 17–2 could be reasonably interpreted in such a manner that .825 man hours per pound is "only" an "item to be considered" as opposed to a controlling labor installation unit. Winger Depo. at 41, 59. He indicated that the "light iron" unit could

properly be applied to configurations weighing as much as 499 pounds. Winger Depo. at 44–45.

*No Further Inquiry by Becon.* Dale Eichhorst admitted that Becon received a copy of Comstock's written inquiry to the MCAA. 2R3 at 103. Becon also received a copy of the MCAA's response to Comstock's inquiry. 2R4 at 4–5; 2R3 at 104; P.E. 1427.

Eichhorst acknowledged that Becon could have sent a similar inquiry to the MCAA to verify its own interpretation, but did not. 2R3 at 104–105.

## G. Pricing of Later Changes.

Generally speaking, changes involving work not clearly within the category of "light iron" in 17–2 were differently priced. P.E. 3007. In CCN 001, involving work on the tank farm, Comstock took the trouble to distinguish the steel work in that proposal from the "hanger supplemental steel proposals." 2R1 at 165–68; P.E. 3007–001. Similar qualifying language was added to a proposal involving relocation of roof penetration steel which Comstock considered structural steel. 2R1 at 174–75; P.E. 3007, CCN 150–COR 1027.

In several cases (e.g. CCN 150–COR 1121, CCN 150–COR 1142, and CCN 159–COR 1105) change orders included prices for ladders, stairs, landings and other steel items which the parties agreed were not supplemental steel. 2R1 at 171–72; P.E. 3007. Similarly, the supplemental steel rate was not applied to Unistrut items. 2R1 at 172–73; P.E. 3007, CCN 095. In two cases involving truss supports for pipe, CCN 198–COR 1024, and CCN 198–COR 1107, Mayne agreed to less than the .825. 2R1 at 182–85; 2R4 at 15; P.E. 3007.

In at least six other cases, the .825 factor was applied in change orders. P.E. 1500. According to Becon's Dale Eichhorst, however, Comstock understood at the time that there was still a controversy over payment of the two main supplemental steel change orders at the .825 rate. 2R3 at 56–57; 2R4 at 18–24. This was corroborated by Comstock's John Mayne. 2R2 at 125–27.

## H. Becon Raises Issue of Section 4(c) of the General Conditions

In January 1989, long after Comstock completed the Project and litigation appeared imminent, Becon first drew attention to Section 4(c) of the Becon General Conditions. P.E. 3009. That section provides:

4. *CHANGES IN THE WORK*

C. Compensation for changes in the work or for extra work as described in Section 5, shall be determined by one of the following methods as selected by contractor:

1) agreed lump sum price or

2) use of unit price(s) established within the subcontract; or

3) by contractor's determination of its fair value.

P.E. 1955.

There was no testimony that this provision, contained in the contract materials furnished by Becon to Comstock and other bidders, was ever the subject of negotiations or discussions between the parties either prior to or during performance of the supplemental steel installation here at issue. To the contrary, neither Becon nor Comstock could recall Becon ever insisting during this period that it could unilaterally elect "fair value" instead of the applicable unit fate for steel, or indeed for any other changed work covered by the MCAA Manual. Sheridan Depo. at 62; 2R1 at 201; 2R3 at 141; 2R4 at 83. This is particularly significant since during this same period in late 1987 and early 1988 when Becon became aware of Comstock's claim of nearly $3,000,000 for supplemental steel, the parties continued to negotiate over the precise language of Article 5.3 of the Subcontract, with its language that the "standard used [for labor installation units] will be the [MCAA] estimating guide." The Subcontract was finally signed on February 26, 1988. R3 at 119–20.

Moreover, all previous communications had emphasized that where applicable unit prices could be identified in the MCAA manual, those prices controlled. *See supra* Part II.A for a discussion.

Under direct examination regarding the contents of Section 4 of the Becon General Conditions, Becon's Dale Eichhorst did not at first recall the "fair value" option set forth in 4(c). 2R3 at 28–29. When first shown the language of that section, Eichhorst stated that "the MCAA was the instrument to be used to price certain change orders. *If a unit, a unit price was not in the MCAA manual, you had to use other options in pricing.*" 2R3 at 29 (emphasis added).

At the time Becon made reference to its "fair value" option under 4(c), it instructed Comstock for the first time to account for the supplemental steel on essentially a time and material basis. P.E. 3009. However, no one ever anticipated that Comstock would track supplemental steel on any basis other than poundage; 2R3 at 120; and Becon never directed Comstock to maintain records of actual costs of supplemental steel installation. 2R1 at 199–200.[11]

## III. WHERE IT APPLIES, THE MCAA MANUAL CONTROLS PRICING OF CHANGES UNDER THE PARTIES' CONTRACT [12]

### A. Applicable Legal Principles

### 1. The Intent of the Parties Controls

■ An elemental principle of contract law is that a contract is to be interpreted or construed in accordance with the intention of the parties. The court must seek to ascertain how the parties intended their agreement to operate at the time they entered into it. *See e.g., Wilcox v. Wilcox,* 406 S.W.2d 152, 153 (Ky.App.1966); *Communications Workers of America v. General Tel. Co.,* 236 F.Supp. 588, 589 (E.D.Ky.1965). "Where the parties have attached the same meaning to a promise or agreement or a term thereof, it is interpreted in accordance with that meaning." Restatement (Second) of Contracts 201(1) (1979).

■ When the express terms of the agreement leave no doubt as to the intent of the parties, the contract should be enforced in accordance with those terms in the absence of other defenses. *Veech v. Deposit Bank of Shelbyville,* 128 S.W.2d 907, 911 (Ky.1939).

In most litigated cases, however, it is necessary or appropriate for courts to resort to extrinsic evidence or familiar rules of construction to determine the intent of the parties and the legal effect of an agreement. This case is no exception.

### B. The Instant Contract

■ Section 5.3 of the Subcontract seems clear and straightforward. On its face, it mandates the use of certain pricing manuals to establish unit rates for installation of mechanical and electrical work, including the MCAA Labor Estimating Manual.

A question of meaning is raised, however, by a separate provision in one of the many pages incorporated by reference in the Subcontract. Section 4(c) of the General Conditions indicates that the General Contractor (Becon) has certain alternatives for pricing of extra work.

■ Being obligated to read the parts of the contract as a whole, we must seek interpretations which promote harmony between such provisions. *Cook United, Inc. v. Waits,* 512 S.W.2d 493, 495 (1974); *Citizens Fidelity Bank & Trust Co. v. U.S.,* 209 F.Supp. 254, 256 (W.D.Ky.1962).

Without looking beyond the face of the agreement, there are two ways to read this provision more or less harmoniously with Section 5.3. One approach, urged by Comstock, is to view the terms of 5.3 as an establishment of a rate structure for pricing of change orders which will be used to price change orders under 4(c)(2) of the General Conditions. In Comstock's view, where a labor installation unit rate has been established by the MCAA Manual, Becon is bound by this pricing mechanism for pertinent change orders and Becon may not unilateral-

---

**11.** In only one case was Comstock directed to perform supplemental steel work on other than a unit price basis. 2R1 at 202–03; P.E. 1138.3 In that instance, the actual cost of the work exceeded the labor installation unit of .825 established by the MCAA Manual. 2R1 at 203–04; 2R3 at 147.

**12.** Parts III–VIII constitute the Special Master's Conclusions of Law.

ly price on another basis. Comstock Reply Brief at 13. Put another way, by agreeing to the unit pricing system at the beginning of the job Becon elected that approach to the exclusion of other choices under 4(c) for situations where unit prices were provided.

Becon urges a different interpretation, namely that Becon is free to elect at any time any of the 4(c) mechanisms despite the presence of a unit pricing system in the Subcontract. At the time certain extra work is performed it may either agree to apply the unit price figure established under 5.3 of the Subcontract, agree to a separate lump sum, or determine a fair price for the change.

In order to ascertain the intentions of the parties and to resolve the ambiguity resulting from the interplay of these provisions, it is appropriate to consider all of the circumstances surrounding the transaction, including the acts and declarations of the parties and their underlying purposes. Other rules of construction may be drawn upon if appropriate. All of these considerations support Comstock's interpretation.

## C. All of the Surrounding Circumstances, Including the Acts, Conduct, and Declarations of the Parties, Indicate a Mutual Intent to Make the MCAA Manual Controlling Where It Contains an Appropriate Rate

■ Under Kentucky law, courts construing contracts which are facially reasonably susceptible to more than one interpretation are required to give great weight to contemporaneous acts, conducts, or declarations of the parties which indicate a mutual intent and understanding. *A.L. Pickens Co. v. Youngstown Sheet & Tube Co.*, 650 F.2d 118, 120 (6th Cir.1981). The available extrinsic evidence strongly supports the interpretation urged by Comstock.

### 1. The Negotiations Leading Up to the Contract Support This Interpretation

■ In ascertaining the intent of the parties it is appropriate to consider the situation of the parties, the object or purpose of the agreement, the conditions under which the agreement was made, and the circumstances surrounding the execution of the agreement. *McHargue v. Conrad*, 312 Ky. 434, 227 S.W.2d 977, 979 (1950); *Taylor v. Rosenthal*, 308 Ky. 4, 213 S.W.2d 435, 437 (1948).

Comstock's original bid form indicated that it would perform additional work "which incurs costs not contemplated by the UNIT PRICES, in accordance with the GENERAL and SUPPLEMENTARY CONDITIONS." This offer by Comstock conveyed an initial understanding that unit prices, where established, would control; only where changes were not covered by the unit prices would the parties resort to the General and Supplementary Conditions—including, presumably, the Changes provision, Section 4(c).

What followed was an intensive round of negotiations focussed on the unit price issue and the need for mutually agreeable standards for unit pricing in light of the myriad of changes expected to follow. After much review, two industry estimating manuals were agreed upon as the basis for labor installation rates. Significantly, a contemporaneous memo from Becon's Project Manager notifying Becon corporate management of this development stated without qualification that the MCAA Manual "will be used to determine the labor portion of changes to this Subcontract." P.E. 1228.

The final language of the Subcontract ("The following unit prices are for use in pricing additions or deletions in the work.... The standard used will be the estimating guide ...) emphasized the mandatory nature of the rates.

At no point prior to the signing of a letter of intent in the spring of 1987 or the execution of the formal subcontract document almost one year later did the parties discuss nor did Becon draw attention to any residual unilateral authority to negotiate or price changes otherwise covered by contractual unit prices at a "fair" price. This was true even after the issue of the applicability of the MCAA Manual to supplemental steel became a critical issue on the Project.

### 2. The Parties' Course of Performance Evinces Mutual Intent That Unit Prices Control

■ In *Black Star Coal Corp. v. Napier*, 303 Ky. 778, 199 S.W.2d 449, 451 (1947), the

court stated, "A reasonable construction by the parties of an ambiguous contract, although not conclusive, will be given great weight by the court, and such construction is best evidenced by the voluntary and positive acts of the parties in executing the contract." *See Giem v. Searles,* 470 S.W.2d 327, 329 (Ky.1971); *Colorado Mill & Elevator Co. v. Glenn,* 118 F.Supp. 943, 948 (W.D.Ky.1954).

Similarly, "[w]here an agreement involves repeated occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other, any course of performance accepted or acquiesced in without objection is given great weight in the interpretation of the agreement." Restatement (Second) of Contracts 202(4) (1979).

Having devoted substantial effort to the negotiation of a unit pricing structure that would accommodate the wealth of changes anticipated on the Project, the parties appear to have adhered to the mechanism throughout performance.

Even when issues arose regarding the proper pricing of supplemental steel, Becon couched the discussion in terms of the applicability of the .825 rate for "light iron." Mr. Sheridan had cause to note in late November, "Becon and Ohbayashi have accepted appropriate MCA rates for past changes orders and will continue to do so . . . ." Repeated Becon missives during early 1988 continued to focus on whether Comstock properly applied the "light iron" rate. No mention was ever made of Becon's "right" to seek a fair price under 4(c) of the General Conditions.

There is no evidence that the parties ever knowingly used other methods for pricing change orders when the pricing mechanisms in Article 5.3 applied.[13] Becon's repeated assent to change orders involving minor amounts of structural steel priced at the .825 rate, while not dispositive regarding the applicability of that rate, lend further weight to the conclusion that the parties relied upon the unit pricing structure within its purview.

### D. This Interpretation is Further Supported by the Sworn Statements of Becon Witnesses.

During his deposition, Becon's Paul Sheridan admitted, "The agreement we had with Comstock all along was to use the appropriate MCA rates. If there was no appropriate MCA rates, then the contract calls for negotiation on a rate."

Mr. Eichhorst's testimony regarding the interplay between Article 5.3 and General Conditions Section 4(c) was inconsistent. However, his most revealing moment occurred when, during direct examination, he failed to recollect the "fair value" option of 4(c) at all. Then, after being shown the language of the section, he recalled that "the MCAA was the instrument to be used to price certain change orders. If a unit, a unit price was not in the MCAA manual, you had to use other options in pricing."

### E. The Parties' Evident Principal Purpose is Better Effectuated by Interpretation That Unit Prices Control

"Words and other conduct are interpreted in light of all the circumstances, and if the principal purpose of the parties is ascertainable it is given great weight." Restatement (Second) Contracts 202(1) (1979).

From the beginning, Becon made it clear in public and in private that the development of a satisfactory unit pricing mechanism was of critical importance to the job. It was clear that the unit pricing approach was being viewed as a system for addressing a broad spectrum of potential changes involving many different kinds of components—not comprehensive, but as comprehensive as possible. As Barney Winger testified, the many and various rates set forth in the MCAA Manual are acceptable within the context of a "total estimated system"; that is what the adoption of the Manual in Article 5.3 was intended to produce.

At the same time, however, the parties did not intend to use the rate schedule as it was

---

**13.** Kentucky courts have recognized that parties to a contract may elect between alternative provisions by their conduct or silence. *See e.g.,*

*Stephens v. Preston's Heirs,* 300 Ky. 843, 190 S.W.2d 468, 471 (1945).

originally designed by the MCAA to be used. They agreed not to use the wide array of corrective factors intended by the MCAA to reflect various field and work conditions which actually affect labor productivity and installation cost of mechanical work performed. Becon and Comstock agreed to proceed with the work without any application of these factors, even if they encountered conditions which would otherwise warrant their application. Their intent was to provide a straightforward pricing system with as little room for negotiation and with as few variables as possible—an important goal on a project where numerous changes were contemplated, time was of the essence, and quick processing of extras was essential to all concerned. To achieve these goals, of course, each party assumed the risk that in a given case resultant pricing might or might not reflect the actual or reasonable cost or value of procurement and installation.

The interpretation urged by Becon—that Becon was entitled in any event to forsake the unit pricing structure in favor of what it determined to be a "fair" price—is totally inconsistent with the evident purpose of the parties' detailed negotiations regarding a unit pricing system. If applied in practice, it would have upset the "total estimating system" established by the parties in adopting the MCAA Manual, and would threatened the goal of quick, clear pricing which was to be served by using the "bare" rates in the Manual.[14]

Becon's approach, to the extent it would require Comstock to provide time and material records to establish "fairness" also flies in the face of the parties' expectation from contract inception that Comstock would only keep track of supplemental steel by poundage, and not maintain records of labor associated with specific work tasks or changes. When, some months after the completion of the Project, Becon first demanded the latter to establish a "fair" price for supplemental steel, there were no records to be found.

## F. Other Rules of Construction Support the Same Conclusion

The foregoing summary of circumstances surrounding the contract clearly establishes that the parties intended that the unit price mechanism set forth in Article 5.3 of the Subcontract was to govern where unit rates were provided. Were this conclusion doubtful, however, other rules of construction would still command the same result.

### 1. An Interpretation That Renders All Terms Reasonable and Effective is Sought

 "[A]n interpretation which gives a reasonable, lawful, and effective meaning to all the terms is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect." Restatement (Second) of Contracts 203(a) (1979).

Just as the interpretation urged by Becon is inconsistent with the underlying purposes of the unit pricing scheme established by the parties, it would fail to give the mandatory wording of Section 5.3 and the carefully negotiated price structure within it "a reasonable . . . and effective meaning."

### 2. Specific and Exact Terms Are Given Greater Weight; "Dickered" Terms Are Given Greater Weight Than Standardized Terms.

 "In the interpretation of a promise or agreement or a term thereof, . . . specific terms and exact terms are given greater weight than general language; . . . [and] separately negotiated or added terms are given greater weight than standardized terms or other terms not separately negotiated." Restatement (Second) of Contracts 203(c), (d) (1979).

General Conditions Section 4(c) is a part of Becon's pre-printed, standardized boiler plate contract terms. Nothing contained in the General Conditions was a "separately negotiated or added" term. In contrast, the

---

14. In its brief, Becon points out its contractual prerogative to award someone other than Comstock all or part of the overrun steel installation. Becon Brief at 49. It did not choose this option, however, for the simple reason that hiring another contractor to do this work would have caused utter chaos and presumably cost far more in time and money than Becon was willing to pay. 2R2 at 100. (Broadly employed, moreover, such deductive changes might conceivably have resulted in—dare we say it?—a cardinal change.)

Subcontract agreement, Article 5.3 thereof, and the scope of work were in fact "separately negotiated" and "added terms." As such, Article 5.3 must be given greater weight than the standardized terms Becon relied upon, particularly if they are inconsistent. Additionally, Article 5.3 is specific as to pricing, by referencing detailed labor and material rates, and arguably governs over the very general changes scheme set out in Section 4.3 of the General Conditions.

Of course, the interpretation urged by Comstock and all of the surrounding circumstances involves an interplay between these provisions which gives effect to both and does violence to neither.

### 3. The Contract Must Be Construed More Strongly Against the Party Who Prepared the Document.

 Finally, Kentucky law recognizes the general principle that a contract must be construed more strongly against the party which drafted the document. *Pulliam v. Wiggins*, 580 S.W.2d 228, 231 (Ky.App.1978). When a contract term is susceptible of two meanings, therefore, doubts will be resolved against the drafter of the instrument. *B. Perini & Sons v. Southern Ry. Co.*, 239 S.W.2d 964, 965–66 (Ky.1951); *Fidelity & Depos. Co. v. Lyon*, 276 Ky. 411, 124 S.W.2d 74 (1938). This principle is applied as a last resort, where other rules of construction have failed to establish the legal consequences of an agreement. *Elliott v. Pikeville Nat'l Bank & Trust Co.*, 278 Ky. 325, 128 S.W.2d 756, 760 (1939).

Were all else in doubt, which it is not, we would still resolve the interpretational question against Becon since that party authored the contract, including the standardized General Conditions containing the changes provision, Section 4(c). As the party initially preparing the labyrinthine contract documents and very much at the helm during the entire process of finalizing the agreement between the parties, Becon was in much the better position to avoid interpretational issues of this sort. This is particularly so since the

matter was apparently of so much import to Becon—and Becon was otherwise so emphatic regarding the minutiae of contract language.

### IV. THE MCAA MANUAL PROVIDES AN APPLICABLE LABOR INSTALLATION UNIT RATE FOR STEEL INSTALLED AS PIPE HANGER SUPPORTS

#### A. The Language at Issue

 Having established that the labor installation units set forth in the MCAA Manual control pricing of change orders where applicable, we now turn to the question of the applicability of the provisions addressing "light iron" on page 17–2 of the Manual.

Comstock maintains that the .825 figure associated with "light iron" controls pricing of supplemental steel associated with support of piping in two major change orders. Becon counters with a number of arguments which focus on the nature and applicability of the same figure:

(1) 17–2 does not set forth a labor installation "rate," but only raises considerations affecting the application of other rates in the Manual;

(2) if the figure of .825 is a rate, it does not apply to supplemental steel items which fall outside the narrow shape and weight categories listed;

(3) if the figure of .825 is a rate, it is inappropriate since Comstock did not "fabricate" in the field.[15]

Once again, the Special Master's reading must be made in context of understanding of all circumstances. Once again, the context clearly supports the position advanced by Comstock.

#### B. All of the Circumstances Indicate That the Page 17–2 Sets Forth Unit "Rates" for Labor Installation

##### 1. The Provisions of 17–2 are Not Significantly Different from Other Portions of the MCAA Manual

Article 5.3 establishes that unit rates for installation of mechanical work—that is, the

---

**15.** At various stages, Becon has raised other issues respecting the fairness or appropriateness of Comstock's supplemental steel pricing, including the proper allocation of supplemental steel covered by the allowance and "additional" supplemental steel. However, the evidence fails to support such defenses.

number of hours required to perform a unit of work—will be determined in accordance with the MCAA Manual. The Manual consists of hundreds of pages of statements indicating a specific number of man hours required to do certain mechanical work tasks.

Although the parties do not appear to have specifically discussed the application of the Section entitled "Light Iron & Structural Shapes" prior to late 1987, there is no critical distinction between the contents of page 17–2 from other categories of labor installation units in the Manual. Although the format is not tabular like many other pages of the Manual and the categories of "light iron" and "structural shapes" are broader than certain other work categories in the Manual, the effect is the same: a specific number of man hours are identified with a particular unit of work. In this case, a definite number of man hours are identified with the installation of a pound of steel.

Page 17–2 (P.E. 1491) begins by cautioning that steel work can be costly, can cause a serious labor loss, and must be approached with extreme caution. Becon complains that the MCAA does not set forth different rates for different structural shapes or is somehow deficient in failing to provide the same degree of specificity as page 4–1. The Manual expressly states, however, that "[l]abor will vary just by the quantity or configurations involved (from a single bracket or support to many items and shapes of miscellaneous iron)." P.E. 1491, p. 17–2. With this caveat, the MCAA manual then sets out to do precisely what the other estimating manuals referenced by Becon in developing its offer do: price the labor by the weight of the steel. Because of the almost infinite variety of supplemental steel configurations, it would be virtually impossible for any estimating manual to delineate a unit price other than by man hours per pound. The MCAA Manual forth a specific starting point for establishing hours per unit associated with installation of steel. Because Becon and Comstock agreed to exclude labor correction factors, moreover, this starting point is also the *end point* for

establishing hours per unit of steel.[16] The section entitled "Light Iron & Structural Shapes" is unlike the considerations set out under the heading of "Labor Correction Factors" which were designed by the MCAA to reflect various field and work conditions which affect labor productivity and installation cost. Also, unlike the Labor Correction Factors, it was not specifically excluded from use by the parties by Article 5.3 of the Subcontract. From the foregoing, one is compelled to conclude that the .825 and 0.03 figures set forth on page 17–2 are intended to function as labor installation units or "rates" as described in Article 5.3 of the Subcontract.

### 2. Acts and Declarations of the Parties

The contemporaneous acts and statements of the parties indicate that despite an ongoing debate regarding the appropriateness of applying the .825 unit to supplemental steel, there was not a question regarding the characterization of the number as a rate. *See supra* Part II.C. Although during the lengthy give and take of the winter of 1987–88 Becon representatives devoted time and effort to developing a number of rather specific challenges to the way in which the .825 rate should be applied, there were no contemporaneous communications to the effect that "this ain't no rate."

That this was the case is corroborated to an extent by the sworn testimony of Becon representatives. Both Mr. Sheridan during his deposition and Mr. Eichhorst during trial slipped into referring to the .825 unit as a "rate" despite repeated objections by Becon's counsel concerning such characterizations.

### 3. Interpretation of MCAA Labor Estimating Manual Committee

A unique feature of this dispute is the availability of testimony by a disinterested source who is not only a long-time member of the pertinent trade but was also chairman of the very committee of the MCAA charged with matters concerning the MCAA Manual.

---

**16.** The Special Master finds that the statement preceding the statement of labor installation units to the effect that "the following items should be considered" does not compel a different conclusion. Rather, this appears to be a transitional statement introducing the two categories for which labor installation units are proffered.

His sworn testimony under close examination by counsel for Becon is extremely probative. Along with the written opinion of the committee he chaired, it provides strong, persuasive corroboration of already strong evidence supporting Comstock's interpretation of the Manual.

To resolve the dispute regarding applicability of the .825 figure to supplemental steel, both Comstock and Becon contacted the MCAA, the organization which published the Manual, by telephone. After an initial disagreement between the parties regarding the MCAA's oral response, Comstock undertook to seek a written interpretation from the MCAA. Comstock's written communication was presented to the MCAA Labor Estimating Manual Committee, which discussed Comstock's letter and rendered an opinion.[17]

Under intensive questioning by counsel for Becon, Committee Chairman Barney Winger, a mechanical contractor of thirty years experience, unequivocally reiterated his conclusion, and that of the committee, that Comstock's interpretation of page 17–2 was correct. In so doing, he described the .825 figure on page 17–2 of the Manual as "a man hour unit which has been calculated to apply under the circumstances, which it [sic] is here defined as light iron." He also indicated that the number could be described as a "rate," and explained how this unit could be applied to determine the number of hours to be allocated to installation of a light iron configuration of as much as 499 pounds. He also testified that although the format of 17–2 was somewhat different from some other sections of the MCAA Manual, this was not a convincing basis for treating these units any differently from other units in the Manual.

## C. The .825 Labor Installation Unit Applies to Supplemental Steel Installed for Support of Pipe Hangers

### 1. Terms of 17–2

At the heart of our dispute are three terms: "supplemental (or supplementary) steel," "structural steel," and "light iron." The term "structural steel" appears in Article 2.0 of the Summary of Work labeled "WORK PERFORMED BY OTHERS" where it is specifically associated with the building frames and trestle steel, monorail cranes and steel. The first two terms also appear Section 49 of the Summary of Work, which provides that "in addition to ... miscellaneous structural steel" the Subcontractor is required to provide certain other steel components. "Supplementary steel is included where required." This verbiage indicates that supplementary steel is to be distinguished from structural steel, but provides no definitions. Page 17–2 of the MCAA Manual contains references to "structural steel" and "light iron." The present controversy centers about the .825 rate assigned by the Manual to "light iron."

### a. Supplemental steel vs. structural steel

According to the evidence presented, supplemental steel is distinguished from structural steel by the parties and by common usage in the construction industry. It is also consistently identified with the support of piping and with the pipefitter's trade as opposed to the ironworker's.

***Working definitions by the parties.*** A review of the sworn testimony of representatives of both sides indicates substantial agreement regarding the difference between structural steel and supplemental steel. From all of this the Special Master concludes that "structural steel" refers to beams, columns, angles, channels, and other steel elements which function as the primary support for a building. It is typically erected by ironworkers. "Supplemental steel" refers to steel shapes which are necessary to supplement the structural steel of a building for certain ancillary purposes such as the support of piping systems. When used for the pipe support, supplemental steel is typically erected by pipefitters.

As Mr. Mayne explained, the same shapes—wide flanges, Ts, channels, angles, and other forms may be classified either as structural steel or supplemental steel depending on their use.

---

17. Although both Mr. Eichhorst and Mr. Sheridan admitted that the Committee would reasonably be expected to know how to interpret its own manual, Becon made no written follow-up.

*Trade usage.* These functional definitions are consistent with applicable trade usage.[18] The AISC Code of Standard Practice for Steel Buildings and Bridges defines structural steel as "the steel elements of the structural steel frame essential to support the design loads." It does not include "[i]tems required for the assembly or erection of materials supplied by trades other than structural steel fabricators or erectors." By the latter definition, supplemental steel erected by pipe fitters for support of piping systems is not structural steel.

### b. Terminology in the MCAA Manual: Structural steel and "light iron"

The MCAA manual states:

> Light iron is that material which is not considered structural steel such as angles or channels etc. Structural steel is wide flange beams, H-columns, etc.

The MCAA Manual, like Section 49 of the General Conditions, does not define structural steel. There is no logical reason to assume that it refers to structural steel in any but the sense in which it is commonly used— that is, steel incorporated as a part of the primary structure of a building.[19] The reference to "wide flange beams and H-columns, etc." indicates certain examples of shapes which may be installed as part of the structural frame of a building. This is clear from the use of "etc." and from the obvious omission of many shapes commonly employed in the primary structural system.

"Light iron," is, significantly, defined as "that ... which is not ... structural steel." This negative definition recalls the language of the AISC Code, which excluded from the definition of structural steel "[i]tems required for the assembly or erection of materials supplied by trades other than structural steel fabricators or erectors"—including supplemental steel installed for the support of piping systems. The conclusion that "light iron" is intended to refer to "supplemental steel" is compelled by language describing

the "light iron" task associated with the rate of .825 man hours per pound, which includes "*fasten[ing] either by bolting or welding to building construction.*" This reasoning is also bolstered by the context: a manual by mechanical contractors for mechanical contractors. Mechanical contractors, and specifically pipe fitters, typically install steel for the support of piping systems. Any volume aspiring to comprehensively address the many and varied costs of installation must treat steel pipe supports.

Again, the reference to "angles or channels, etc." is clearly illustrative and not exclusive. Again, numerous other shapes (including wide flange shapes) which may be employed for the same purpose are not mentioned, but there is no logical reason to assume they are therefore not included in the definition. Although the illustrative language might have been more artfully drafted, context and logic support only one meaning.

According to the MCAA Manual, the "light iron" tasks associated with the .825 man hours per pound rate include: unloading, fabrication, distribution, erection, and fastening.

In performing work on the Project, Comstock did "unload, fabricate, distribute, erect, and fasten" the supplemental steel members as the light iron rate presupposes. Although Becon raised a question regarding the extent to which field fabrication was performed on this job, (1) there was more field fabrication on this job than on a well engineered job, and (2) although savings from shop fabrication would normally result in a labor correction factor, the parties agreed to exclude such considerations here. Moreover, in approving Comstock's application of the .825 rate the MCAA Labor Estimating Manual Committee was aware of the installation procedures employed by Comstock. Also, there is some reason to believe that the MCAA Manual equated "fabrication" with "assembly."

---

**18.** "Unless a different intention is manifested," says the Restatement, "technical terms and words of art are given their technical meaning when used in a transaction within their technical field." Restatement (Second) of Contracts 202(3)(b) (1979). This well-recognized principle is made explicit in the General Conditions of the Subcontract.

**19.** This is especially so since the contract requires us to follow trade usage.

From the foregoing it appears that the category of "light iron" covers supplemental steel installed for support of piping systems by Comstock.

### 2. Course of Performance

The functional distinction between "structural steel" and "light iron" is fully consistent with the parties' contemporaneous interpretation as evidenced by executed Subcontract amendments. Determinations regarding pricing of steel were based not on shape but on function. In a number of cases, for example, angles and channels were priced at a rate other than .825 for the specified reason that the "steel work involved ... [was] not similar to that requested in ... [the] hanger supplemental steel CORs."

It is not possible in light of both parties' awareness of the ongoing controversy regarding the primary supplemental steel change orders to read Becon's approval of other Subcontract amendments applying the .825 rate to supplemental steel as waiving their defenses with respect to the main issues in dispute. On the other hand neither does it detract from Comstock's case.

### 3. Interpretation of MCAA

As previously stated, the statements of the MCAA Labor Estimating Manual Committee and the testimony of Barney Winger, Chairman of committee, are entitled to much weight. Based on a verbal description by Comstock of supplemental steel installation and sample working drawings from the job, the Committee concluded that Comstock's application of the .825 unit for "light iron" was "consistent with the intent of the Labor Estimating Manual." Mr. Winger subsequently testified that the .825 unit was appropriate for steel shapes and configurations within the light iron category which were significantly heavier than the average weight described in Comstock's letter.

### 4. The Parties' Evident Principal Purpose

As previously noted, the parties intended to establish a pricing system which would provide an efficient means of dealing with many change orders. With this end in mind, it is to be expected that they would want their pricing mechanism to be as comprehensive and as straightforward a system as possible.

Becon's interpretation of MCAA language regarding "Light Iron & Structural Shapes," would detract from this end (1) by providing no guidance for pricing of pipe supports which are not angles and channels, or of configurations which consist only partly of angles and channels; and (2) by requiring separate, different treatment of different shapes used for the same function.

### 5. An Interpretation That Renders All Terms Reasonable and Effective

For the reasons previously stated, Comstock's interpretation of page 17–2 of the MCAA Manual and its application of the .825 rate for light iron to supplemental steel is the logical and reasonable one—a more comprehensive pricing system tied to the functional realities of mechanical work. Becon's interpretation, on the other hand, envisions a spotty pricing mechanism which covers some shapes and not others, provides no guidance as to the treatment of configurations containing "mixed" shapes, and ignores trade usage and functional distinctions.

## V. THE PARTIES' AGREEMENT WILL NOT BE OVERTURNED ON GROUNDS OF FAIRNESS

Under the agreement of the parties Comstock is entitled to assign a value of .825 man hours per pound to supplemental steel installed for pipe supports. Becon has established no grounds for denying enforcement to this agreement.

Courts are properly reluctant to undo private bargains. This must be particularly so where the parties are large, sophisticated contractors who bargained at arm's length.

■ Becon has repeatedly attacked the fairness and reasonableness of the .825 rate. Yet general considerations of fairness will not defeat a contract in the absence of a demonstration of unconscionability. Kentucky courts frequently have upheld parties' bargains, even if one-sided, examining all the circumstances surrounding the transaction and the relative bargaining positions of the parties. *See, e.g., Jones v. Hanna,* 814

S.W.2d 287, 288–89 (Ky.1991). The exceptional cases must involved "one-sided, oppressive and unfairly surprising contracts, and not … the consequences per se of uneven bargaining power or even a simple old-fashioned bad bargain." *Louisville Bear Safety Serv., Inc. v. South Central Bell Telephone Co.*, 571 S.W.2d 438, 439–40 (1978).

█ Becon introduced evidence of amounts paid for steel to other contractors on the Toyota Project. For the reasons stated in Comstock's Brief, however, it is of limited probative value. (Comstock Brief at 14–17). Moreover, the only evidence of Comstock's actual labor costs on the Project is a single change order for which Comstock maintained records of specific labor and material costs—and this evidence reflects a labor installation unit *higher* than the .825 rate established by the MCAA Manual.

There is here no substantive or procedural basis for a finding of unconscionability, and no argument to that effect by Becon—only dissatisfaction with the bargain struck. Both parties agreed to adhere to an estimating system which would overcompensate in some cases and undercompensate in others. The Special Master has not doubt that had the shoe been on the other foot Becon would have pressed its rate-based argument to the limit. Like Comstock, Becon must live with its bargain.

## VI. CONSTOCK IS ENTITLED TO DAMAGES

Having found that Comstock actually installed supplemental steel of the weight described in COR 122 and COR 177, and having concluded that the .825 "light iron" labor installation figure properly applies to this installation, the Special Master concludes that Comstock is entitled to receive the full amount claimed under these change orders: $1,428,766.33 for supplemental steel under Count 7 and $1,515,954.98 under Count 8. Under Subcontract Change Amendment 198

**20.** Even without a pre-judgment interest provision in the Subcontract, an award of pre-judgment interest is within the discretion of the Court. *Nucor Corp. v. General Elec. Co.*, 812 S.W.2d 136, 141 (Ky.1991). Because calculation of damages is not at issue once the MCAA rate has been determined to apply, the case would be

Becon tendered ten percent of the these amounts, less five percent retainage. Thus Becon has actually paid $135,732.80 towards the Count 7 claim and $144,015.72 towards the Count 8 claim. Therefore, Comstock is entitled to an award of $1,293,033.53 for actual damages on Count 7 and an award of $1,371,939.26 for actual damage on Count 8.

## VII. COMSTOCK IS ENTITLED TO INTEREST UNDER THE CONTRACT

█ The Subcontract provides:
Payments due and unpaid under the Contract Documents shall bear interest from the date payment is due at such rate as the parties may agree upon in writing or, in the absence thereof, at the legal rate prevailing at the place of the Project.

P.E. 1955, General Conditions/CM, Article 12.8.1.[20] Accordingly, Comstock awards interest on Counts 7 and 8, less the amounts paid pursuant to Amendment 198, at Kentucky's legal rate of eight percent [21] from 30 days after each request was submitted. Thus, on Count 7, Comstock is entitled to eight percent interest on the principal amount of $1,293,033.53 from January 9, 1988 until entry of final judgment. On Count 8, Comstock is entitled to eight percent on the principal amount of $1,371,939.36 from February 13, 1988 until entry of final judgment.

## VIII. FINAL CONCLUSION

It is the final conclusion of the Special Master,

1) that entry of final judgment should be made in favor of Plaintiff, Comstock, on Counts 7 and 8,

2) that actual damages in the amount of $1,293,033.53 should be awarded to Comstock on Count 7,

3) that pre-judgment interest be awarded on the principal damages on Count 7 at the rate of eight percent from January 9, 1988 until entry of final judgment,

a prime candidate for pre-judgment interest. *Cf. City of Shively v. Hyde*, 438 S.W.2d 512, 515 (Ky.1969).

**21.** *Ky.Rev.Stat.Ann.* § 360.010.

4) that actual damages in the amount of $1,371,939.36 should be awarded to Comstock on Count 8,

5) that pre-judgment interest be awarded on the principal damages on Count 8 at the rate of eight percent from February 13, 1988 until entry of final judgment.

This 28th day of December, 1993.